Argued February 26, reversed April 16, petition for rehearing
denied May 15, motion to stay mandate denied
May 16, 1969

THORNTON, *Respondent and Cross-Appellant, v.*
JOHNSON, *Appellant and Cross-Respondent.*

453 P2d 178
454 P2d 647

*John R. Faust, Jr.,* Portland, argued the cause for appellant and cross-respondent. With him on the briefs were Cake, Jaureguy, Hardy, Buttler & Mc-Ewen, Portland.

*Robert B. Duncan* and *Leo Levenson,* Portland, argued the cause and filed a brief for respondent and cross-appellant.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

PER CURIAM.

This proceeding is brought under ORS 251.015–251.090 to contest the election of Lee Johnson to the office of Attorney General for the state of Oregon in the general election held on November 5, 1968. Mr. Johnson appeals from a judgment setting aside the election and declaring the contestant, Robert Y. Thornton elected to the office. Mr. Thornton cross-appeals on the ground that the trial court erroneously found that certain charges of false statements were not supported by the evidence.

Mr. Thornton's petition charged that Mr. Johnson "wilfully, knowingly, deliberately and materially" violated ORS 260.380(1) of the Corrupt Practices Act in that he knowingly made material false statements relating to the contestant in letters, circulars and in other media. He further charged that Mr. Johnson wilfully, deliberately and materially paid or caused to be paid and knowingly and deliberately authorized and incurred expenses in excess of those permitted by ORS 260.050. By an amended petition filed during the trial the filing of a false report, after election, was also charged.

The case was tried before three judges of the circuit court for Marion County sitting en banc. That court found no violation of ORS 260.370 or 260.380(1) with reference to alleged false statements about Mr. Thornton. But the court found Mr. Johnson guilty of excessive expenditures and of filing a false expenditure report. The trial court was of the opinion that it was compelled by our decision in *Cook v. Corbett,* 251 Or 263, 446 P2d 179 (1968), to disqualify Mr. Johnson and declare Mr. Thornton elected. The trial court said:

"* * * Now even though these findings may

seem to be unimportant when compared to the grave consequences of our decision, this Court, under the standards impressed upon it in the case of Cook v. Corbett, no longer has discretion and power to determine what may be trivial or unimportant in an election contest; so long as there is a violation of Oregon election law, Cook v. Corbett requires that the office be vacated."

In view of the trial court's construction of *Cook v. Corbett,* supra (446 P2d 179), we wish to further clarify the basis of that decision, which the trial court misconstrued. In the *Cook* case we expressly held that in order for Cook to prevail it was necessary that he prove three elements: (1) that Corbett made false statements, (2) that she made them deliberately, and (3) that the statements were material.

As to the first element the trial court found that Corbett had made false statements and we concurred in that finding. The evidence clearly established that Corbett made false statements, intending to create the belief in the voters that she was "the incumbent Senator holding Position No. 4 to which she was seeking re-election."

As to the second element, we held that the proof that Corbett had made the false statement deliberately was incontrovertible.

As to the third element, we held that conduct may be material even though it may not have changed the result of the election. We further held that "material" was used in the statute in the sense of "substantial" as contrasted with "trivial" and "unimportant." We considered Mrs. Corbett's violation and found that it was material in the sense of being substantial.

It is argued that in calling attention to the Report of the 1955 Legislative Interim Committee on Elec-

tions and the elimination in 1957 (ch 217, Oregon Laws 1957, § 7) of the words "trivial and unimportant and limited in character" from ORS 260.430 we implied that "material" was synonymous with "trivial" or "unimportant." A careful reading of the opinion will show that a reference to the report and the 1957 amendment was in connection with the authority granted under ORS 260.430 to mitigate the drastic punishment required by the act. We did not imply that in determining whether the act had been violated "material" was synonymous with "trivial" or "unimportant." On the contrary, we said specifically that' material was synonymous with substantial.

Before taking up the evidence relating to the charges we must decide two preliminary matters: (1) the rule of construction applicable to the Corrupt Practices Act, and (2) the allocation and measure of the burden of proof.

The general principle that penal statutes are strictly construed has been applied to the corrupt practices acts of other states. *Doughty v. Bryant*, 226 Ala 23, 145 S 420 (1933); *State v. Carter*, 319 SW2d 596 (Mo 1958). There are good reasons for so construing our own act.

In the application of the Act the interest of the parties and the interest of the public must be weighed. An important consideration is the effect which the imposition of the penalty has upon the electorate. ORS 251.080 provides that: "If the judgment sets aside the nomination or election of a person, it shall also declare as nominated or elected for or to the office in question the other person who received the highest number of votes at the election." Thus, a finding that the Act has been violated not only punishes the winning candidate by depriving him of his office, but

it also disenfranchises all of those citizens who voted for him, in the case at bar, 437,850 voters. Under the statute the person who receives the second highest number of votes takes office, not because he has been elected by the people, but because he is pronounced the winner by an act of the legislature. If the person chosen by the voters is disqualified, there simply is no election, *McKinney v. Barker,* 203 SW 303 at 305 (Ky 1918); *Sublett v. Bedwell,* 47 Miss 266, 12 Am Rep 338 (1872).

■ Because a violation of the Act results in disenfranchisement of the voters, we hold that the provisions of the Act should be strictly construed.

■ The measure of the contestant's burden of proof was not before us in *Cook v. Corbett,* supra (446 P2d 179), because the facts in that case were stipulated. The serious consequences visited upon the winning candidate and upon the electorate as a result of disqualification prompt us to construe the Act as imposing upon the contestant the burden of proving a violation of the Act by clear and convincing evidence. When a violation of the Corrupt Practices Act becomes the subject of a criminal prosecution, as it may, the state must prove the violation beyond a reasonable doubt. In a private contest which can result in the disenfranchisement of those who voted for the contestee, the contestant should have the burden of proving his case by clear and convincing evidence.

I

Contributions and Expenditures

■ Under the principles laid down in the *Cook* case, the trial court's conclusion that Mr. Johnson violated the statute by making excessive expenditures can be

sustained only if the evidence shows (1) that Mr. Johnson's expenditures exceeded the amount allowed by statute, (2) that he deliberately exceeded the statutory maximum, and (3) that the expenditure, if in excess of the statutory maximum, was material.

■ Reports filed with the Secretary of State indicate that approximately $140,000 was spent on Mr. Johnson's general election campaign. The law imposes no restriction on the amount that can be spent in a campaign. The law, however, does limit the amount that a candidate may spend from his own funds.[1] In a general election a candidate personally can spend only 10 per cent of the annual salary of the position for which he is a candidate. In this case the limit was $2,000. The trial court found that Mr. Johnson spent more than $2,000 of his own money, or of money the statute treats as his own. The trial court's findings, however, did not specify what particular expenditures by Mr. Johnson were to be considered campaign expenditures.

Mr. Johnson's amended personal statement of con-

---

[1] ORS 260.050 provides:

"No sums of money shall be paid and no expenses authorized. or incurred by or on behalf of any candidate who has received the nomination to any public office or position in this state, except such as he may contribute towards payment for his political party's or independent statement in the pamphlet provided for in ORS chapter 255, to be paid by him in his campaign for election, in excess of 10 percent of one year's salary or compensation of the office for which he is nominated. However, no candidate shall be restricted to less than $250. No sum of money shall be paid and no expenses authorized or incurred by or on behalf of any political party or organization to promote the success of the principles or candidates of such party or organization, contrary to ORS 260.010 to 260.520. For the purposes of ORS 260.010 to 260.520 the contribution, expenditure or liability of a descendant, ascendant, brother, sister, uncle, aunt, nephew, niece, wife, partner, employer, employe or fellow official or fellow employe of a corporation shall be deemed to be that of the candidate himself."

tributions and expenditures filed January 6, 1969, states he contributed $2,000 of which $1,500 was a cash contribution to the Lee Johnson for Attorney General Committee. "Estimated out of pocket expenses for travel, phone and miscellaneous campaign expenditures" were reported to be $500.

The statement of expenditures filed for the Lee Johnson Committee by its treasurer reports a contribution by Bob Bell of $1,657.90 and a payment to Mr. Bell of the same amount for printing services, postage and stationery. It is contended that this contribution constituted a violation of ORS 260.040 which provides in part that a contribution of a "fellow official or fellow employe of a corporation" is considered a contribution by the candidate.

Mr. Bell is a director and a vice president of Eagle Flightways, a corporation. Mr. Johnson was secretary of the corporation and his brother was president. Mr. Johnson had no stock in the company and drew no income and contends that for these reasons he and Mr. Bell should not be considered fellow corporate officials within the meaning of the statute. The statute is ambiguous on this point but we shall assume without deciding that even though the contestee was not a stockholder and received no income from the corporation he was a "fellow official" of the corporation with Bob Bell. The question remains as to whether Bell's contribution was made under circumstances which constituted a "deliberate" violation of the statute.

The same problem is presented with respect to a contribution of $500 made by Robert T. Mautz, who is senior partner of Mautz, Souther, Spaulding, Kinsey & Williamson. The contestee was an associate of the firm at the time he decided to run for the office of Attorney General. Mr. Johnson testified he had been

on leave of absence since the beginning of 1967 and had received no compensation from the law firm since that time. He stated that if he were not elected he would have gone back with that firm. He admitted, however, that he saw a few clients during this period and "serviced" them out of the Mautz office. Although it is not clear whether the statute was intended to include the relationship which existed between the contestee and Mr. Mautz, we shall assume, without deciding, that the contribution is to be treated as though made by the contestee himself. But making the assumption that the Bell and Mautz contributions are to be treated as those of Mr. Johnson himself there is no violation of the statute unless it is shown that contributions were received under circumstances evidencing a "deliberate and material" violation of the statute. ORS 251.025.

■■ We construe the term "deliberate" as used in ORS 251.025 to mean an intentional violation of the statute; a violation which is knowingly committed. In relation to ORS 260.050 a violation would occur and the person elected would forfeit his office only if he made the expenditures knowing that they exceeded the statutory amount or with conscious indifference whether it was in violation of the statute. *State v. Jancigaj*, 54 Or 361, 366, 103 P 54 (1909); *Jenkins v. Carman Mfg. Co.*, 79 Or 448, 453, 155 P 703 (1916); *Heikkila v. Ewen Transfer Co.*, 135 Or 631, 635, 297 P 373 (1931).

In the case at bar there is no direct or circumstantial evidence that Mr. Johnson's excessive expenditures were made deliberately.

■ There is no proof, for example, that Mr. Johnson knew of the Bell and Mautz contributions or that he should have known of them until after the cam-

paign. There is no evidence when either contribution was made or when Mr. Johnson made his own personal contributions. There were over 500 contributors to a campaign fund of more than $140,000. Before declaring void an election because of deliberate overexpenditure, the court must be satisfied that excessive gifts were knowingly received and used.

Another reason why the excessive contributions or expenditures by or on behalf of Mr. Johnson do not appear to have been deliberate is that when money was needed for the campaign the candidate had no difficulty raising substantial sums from persons who could legitimately contribute unlimited amounts to his campaign. For example, an additional $10,000 was temporarily needed for the campaign and a cousin of Mr. Johnson, who had already contributed $40,000, loaned another $10,000 to the campaign committee. Later, because of a miscalculation in the amount of expenditures, it was found the committee did not have sufficient funds to repay the loan. Mr. Johnson so informed his cousin and thereupon the cousin contributed the amount of the loan to the committee. It would not be reasonable to hold that a candidate with that kind of financing would deliberately accept contributions in violation of the Act.

Mr. Thornton also contends that Mr. Johnson personally contributed amounts in excess of those fixed by statute by personally paying for travel, secretarial and other miscellaneous expenses which Mr. Thornton now says were campaign expenses.

In July 1967, after the legislative session, Mr. Johnson employed a Miss Bayley as his personal secretary. Aside from his future political ambitions, this appears to have been a normal procedure. He was a businessman, a state legislator and a lawyer who at

the time was on leave of absence from his former law office. In 1968 she did some campaign work for Mr. Johnson, a substantial part of which was performed during hours for which she was not paid. Miss Bayley continued in his employment after the campaign. Mr. Thornton contends that at least $562 of the salary paid Miss Bayley during the campaign period should be considered a campaign expenditure.

■ We hold that no part of the personal secretary's salary is a campaign expense. There is no proof that Mr. Johnson would not have continued to employ a personal secretary if he had not been a candidate; the inference is to the contrary. Apportioning an expense such as this between campaign and personal use is almost impossible and we do not believe the legislature so contemplated. *In Laub's Expense Account,* 145 Pa Super 513, 21 A2d 575 (1941), held such personal expenses need not be apportioned.

■ Mr. Thornton contends that $56 personally paid by Mr. Johnson to a press clipping service should be considered a campaign expenditure. The evidence supports that contention.

Mr. Thornton claims that at least $145 was personally paid by Mr. Johnson for campaign telephone calls. The only evidence is that a $75.33 telephone bill paid by Mr. Johnson was an expenditure for campaign purposes in the general election. We will treat $75.33 as a proven expense.

Mr. Thornton contends that Mr. Johnson paid other campaign expenses out of his personal account. The only proof offered to support this contention was that during the campaign Mr. Johnson made payments to firms, such as a photographic studio, which performed services or sold materials which could be used in a

campaign. When Mr. Johnson was questioned about these expenditures, he testified either that they were for personal purchases or he could not remember what the payments were for. The invoices for which these payments were made were not produced and no representative of the firms so paid were called. These expenses were not proven to have been campaign expenses and must be disregarded.

Mr. Johnson used his own plane for trips during which he did some campaigning and on two or three occasions he chartered a plane with a pilot and did some campaigning. On an undetermined number of such trips Mr. Johnson combined campaign and non-campaign activities. The number of trips was not established. The part of the cost of any trip which should be allocated to the campaign was not established. Mr. Thornton's estimation of $600 is probably as accurate an approximation as can be made.

■ The travel expense, plus the other expenses which we find were proved, amount to a total of about $730. Mr. Johnson had reported $500 miscellaneous personal and travel expense, so if there was any excess it amounted to about $230. Assuming for the purpose of this case only that the personal travel expense is a personal campaign expense that must be reported, we hold that Mr. Johnson's failure to do so was not "deliberate" within the meaning of the Corrupt Practices Act.

Some of the reasons we stated for holding that Mr. Johnson did not act "deliberately" as regards the contributions of Messrs. Bell and Mautz are also applicable to this assumed overexpenditure of $230.

There is doubt whether a candidate's personal travel in connection with a campaign was intended by

the Oregon statute to be included in computing the amount personally contributed or expended. The statute does not expressly so provide. Mr. Thornton apparently was of the opinion that personal campaign travel was not to be included as a campaign expenditure as no such expenditure is included in his campaign expenditure report. The federal statute, which is an old one, provides that the candidate's travel expenses are not to be considered within the limit on personal campaign expenditures.[2] *In Laub's Expense Account,* supra (145 Pa Super 513), the only case cited by either party on the issue, the court held that the candidate's personal expenditures for "gasoline, oil and meals while campaigning" were not required by the statute to be included in the candidate's report of personal expenditures. The statute of Pennsylvania on this point is similar to that of Oregon.

There is no proof that the expenditures were made deliberately or with reckless disregard whether they were excessive. All the inferences are to the contrary. A person who has available and who spends $140,000 is unlikely to deliberately overspend $230 and thus jeopardize his entire campaign.

---

[2] "(c) Money expended by a candidate to meet and discharge any assessment, fee, or charge made or levied upon candidates by the laws of the State in which he resides, or expended for his necessary personal, traveling, or subsistence expenses, or for stationery, postage, writing, or printing (other than for use on billboards or in newspapers), for distributing letters, circulars, or posters, or for telegraph or telephone service, shall not be included in determining whether his expenditures have exceeded the sum fixed by paragraph (1) or (2) of subdivision (b) as the limit of campaign expenses of a candidate." 2 USCA § 248(c).

## II

### Report of Campaign Expenditure

The trial court also found that Mr. Johnson violated the Corrupt Practices Act by filing a false report of contributions and expenditures. The report was alleged to be false in that Mr. Johnson signed the reporting form in blank and left the filling in of the blanks to his assistants. A notary acknowledged Mr. Johnson's signature without seeing him sign it and the report was then filed. Assuming only for the purposes of this case that signing a blank report did constitute a violation of ORS 260.060 and 260.080, it was not a "material" violation.

In *Cook v. Corbett,* supra (446 P2d 179), we rejected the argument that conduct is not material unless it changes the result of the election. We held that material was used in the statute in the sense of substantial as compared to trivial or unimportant. To be material a violation must be capable of having some possible effect upon the election. If it were otherwise, voters would be disenfranchised by an act of the candidate which could not have an effect upon the election. We hold that signing a blank report after the election is immaterial for the purpose of declaring the election forfeited; because, having occurred after the election, it could not have possibly affected the election outcome. *State ex rel Hampel v. Mitten,* 227 Wis 598, 278 NW 431, 435 (1938).

## III

### Statements Concerning the Attorney General's Performance in Office

Mr. Thornton's cross-appeal challenges the trial court's failure to find that Mr. Johnson violated the

Corrupt Practices Act by publishing material concerning the contestant which Mr. Johnson knew was false.[®]

■ Not unlike state and national candidates elsewhere, both candidates treated crime and law enforcement as a key issue, if not *the* key issue, in their campaigns. Mr. Thornton, as he had in his 1964 campaign, attempted to portray himself as a "crime-fighting Attorney General." Mr. Johnson attempted throughout his campaign to paint the incumbent Attorney General as inept and incompetent in the field of criminal law enforcement. As a matter of fact, the office of Attorney General is only incidentally related to fighting crime, but there is a relationship and both candidates sought to emphasize the incumbent's effectiveness or lack of it in this area.

The following is the complete text of one of the several similar forms of letter which were sent to most of the voters in the state:

> "The purpose of this letter is to ask you personally for your support for Attorney General. Your help is especially important because this is the only statewide office concerned with law enforcement.

> "My opponent has held this vital office for almost 16 years—with what result? Crime in Oregon, is up drastically. During the incumbent's reign in office Oregon has had the unhappy distinction of

---

[®] ORS 260.380(1) provides:

"(1) No person shall write, print or circulate, or cause to be written, printed or circulated, any letter, circular, bill, placard or poster, or cause any paid advertisement to be placed in a newspaper or any other publication, or singly or with others pay for any such advertisement, knowing such letter, circular, bill, placard, poster, publication or paid advertisement to contain any false statement, charge or comment relating to any candidate, or to himself. Any person violating this section shall be guilty of a corrupt political practice."

moving from the lower half to the upper third in serious crime rates in America. Serious crimes threatening your friends and neighbors have occurred recently near your home, Mary, if not on your street itself.

"While crimes such as murder, narcotics peddling, armed robbery, rioting and rape have been occurring with greater and greater frequency, how has the Attorney General performed in court? Three out of four of his official opinions have been overruled by the Oregon Supreme Court. The number of criminal convictions are down substantially. And the past three Oregon Governors, including Democrat Robert Holmes, have found it necessary to hire legal counsel outside the Attorney General's office; a demonstrated lack of confidence in the present Attorney General.

"Clearly the times call for immediate action to halt crime in Salem and throughout Marion County. As an experienced prosecuting attorney in the United States Department of Justice and an Oregon State Representative, I am equipped to do the job. With your help Mary, we can begin to get things done."

The trial court found in effect that the contents of the letters were not false statements prohibited by the Act. We agree with the trial court.

Mr. Thornton contends the quoted statements were false because the Attorney General has no power to combat crime and Mr. Johnson knew this. The parties agree that the Attorney General does not have the power to investigate and prosecute alleged crimes except when directed by the Governor, and the Governor has not so directed in recent years. Mr. Johnson points out, however, that the statutes do delegate to the Attorney General some powers which would enable him to "fight crime." They appear to provide some control

over district attorneys by the Attorney General.[○] The Attorney General is by statute the vice chairman of the Crime Control Co-ordinating Council which has the functions implied by its name and was created in 1967. ORS 423.220. The Attorney General is a member of the Criminal Law Revision Commission. Oregon Laws 1967, ch 573. Mr. Johnson testified, in part, as follows:

"* * * I repeated, time and time again, during the campaign, and I feel this very strongly as I said, every office depends on what the individual that is in it does with it. I feel that an Attorney General who is willing to use that prestige as a statewide officer, statewide officer who most of the public looks upon as a law enforcement officer, who has the confidence of the Governor, confidence of the Legislature, can do much to combat crime in the State of Oregon * * *."

Mr. Thornton, on the other hand, testified, "I would say that the Attorney General is a toothless tiger as far as enforcement of criminal law is concerned."

Mr. Thornton singles out for attack that paragraph in the letter linking a rise in crime and a decrease in convictions with the allegedly poor record of the Attorney General in the Supreme Court.

There was evidence of an increase in crime and a

---

[○] ORS 180.060(4) and (6) provide:

"(4) The Attorney General shall consult with, advise and direct the district attorneys in all criminal causes and matters relating to state affairs in their respective counties. He may require their aid and assistance in all matters pertaining to his duties in their respective counties and may, in any case brought to the Supreme Court from their respective counties, demand and receive assistance of the district attorney from whose county such case or matter is brought."

"(6) The Attorney General shall have all the power and authority usually appertaining to such office and shall perform the duties otherwise required of him by law."

decrease in convictions. The statement concerning the fate of the Attorney General's opinions in this court is ambiguous. The Attorney General's opinions are not reviewed by this court. The Attorney General, as do other lawyers, gives opinions on questions which sometimes are later answered by decisions of this court. There is no evidence of how many of the opinions of the Attorney General were in accord with this court's decisions.

Mr. Thornton charges that the thrust of this paragraph of the letter, taken as a whole, is that the Attorney General was incompetent in the handling of criminal matters before the courts, whereas the fact is that most of the work of the Attorney General, including his opinions and his appearances in court, are concerned with noncriminal matters.

An inference to be drawn from the letter is that the Attorney General failed to prosecute crime or prosecuted incompetently. Another inference to be drawn, however, is that if the Attorney General had performed his duties in a competent manner, regardless of whether in civil or criminal matters, he would have inspired the confidence of public officials and the public and he could have exerted leadership through his office to reduce crime and to secure an increase in convictions.

This latter construction of the inferential possibilities of Mr. Johnson's letters would accord with Mr. Thornton's own assertions of the capabilities of the office of Attorney General.

In his campaign material Mr. Thornton in a most prominent manner described himself as "OREGON'S CRIME-FIGHTING ATTORNEY GENERAL" and "BOB THORNTON: OUR FIGHTING ANSWER TO LAW-BREAKERS." It is true that Mr. Thornton in-

creased the emphasis upon his role in fighting crime after Mr. Johnson's charges were made. However, even in Mr. Thornton's 1964 campaign, a campaign card asserted that he was instrumental in successfully combating crime. It stated: "Took lead in statewide crime and juvenile delinquency prevention and vice clean-ups." Several newspaper articles during the 1968 campaign carried the following statement by Mr. Thornton: "I am very proud of our past record of intensifying our fight against crime through close cooperation with local district attorneys, state agencies and national law enforcement authorities. I also am proud of our record in exposing fly-by-night crooks who pose as respectable businessmen, and our efforts in the courts to protect our great Oregon beaches from illegal exploitation by commercial developers."

Comparing the statements in Mr. Johnson's letter with Mr. Thornton's campaign material it can be seen that the letters seek to exploit the same inference, the office of the Attorney General is capable of leading and fighting a battle against crime. Mr. Johnson's letter and Mr. Thornton's literature completely disagree on the issue of Mr. Thornton's performance as a "crime fighter." The matter is wholly one of opinion.

The claims and counterclaims in an area of opinion cannot be the "false statements" prohibited by the Corrupt Practices Act.

Wisconsin has a provision similar to that of Oregon prohibiting false campaign statements. The following statement was claimed to violate the Wisconsin Act:

"* * * 'During the past year, 1963, *Skibinski* WASTED $1,506.45 of the TAXPAYER'S hard earned MONEY, *in one year alone,* traveling about the country, attending various conventions, and in

general HAVING A GOOD TIME at the taxpayers expense.'" *State ex rel Skibinski v. Tadych,* 31 Wis2d 189, 194, 142 NW2d 838 (1966).

The court held these to be statements of opinion, not of fact.

■ Statements are not false as that word is used in the Corrupt Practices Act if any reasonable inference of opinion or of correct fact can be drawn therefrom. Similarly, it is not necessary that the opinions expressed or reasonably inferred be well founded. If reasonableness were the test, the courts would become censors of political campaigns and would be called upon to judge the reasonableness of all campaign statements and the possible inferences to be drawn therefrom. Courts are, and should be, most reluctant to interfere in the political process and will not do so unless compelled by a clear legislative directive. We do not find such a clear directive in the Oregon Corrupt Practices Act.

■ The distinction between the present case and *Cook v. Corbett,* supra (446 P2d 179), on this issue should be kept clearly in mind. In the *Cook* case the only inference that could be drawn from Corbett's statement was that Corbett was the incumbent Senator holding Position No. 4 to which she was seeking re-election. In the present case the statements were ambiguous. Permissible inferences from the statements could have been either true or false. It is entirely impractical (and we are sure unintended by the legislature) for the court to set aside all elections in which the successful candidates have made statements from which false inferences could be drawn but from which other inferences of fact or opinion likewise could be drawn. This was the basis of our decision in *Mosee v. Clark,* 253 Or 83, 453 P2d 176, decided this date.

Mr. Thornton also charged that Mr. Johnson made a false statement when he issued a press release to the effect that the Attorney General was guilty of malfeasance of office because he made a written demand for damages for anti-trust violations and represented that he was authorized to act on behalf of the Portland School District, whereas he was not.

Whether or not the Attorney General had the authority to represent the School District is open to dispute. Mr. Thornton contends he is authorized by ORS 30.312 to represent school districts. Mr. Johnson contends ORS 30.312 does not authorize the Attorney General to do so and that the Attorney General can only represent a district if expressly authorized by the district and that was not done in this case. The dispute involves a matter of opinion and both positions are reasonably arguable. The press release was not a false statement within the meaning of ORS 260.380(1).

The press release also made the following statement with respect to another anti-trust claim: "It is also curious why he filed this case in California rather than Oregon and retained a high priced San Francisco law firm, the senior partner of which is a well known Democratic officeholder. It will take taxpayers dollars to pay these lawyers."

The fact is that no law firm was retained. The evidence is that two associates of Mr. Johnson and Mr. Johnson, personally, all made inquiries about this subject and were led to believe that a well known San Francisco law firm had been retained by the Attorney General. There was no evidence that the statement was knowingly false when made.

The trial court found the statements in the press release were not in violation of the Corrupt Practices

Act and we concur. As we previously stated in this opinion as well as in *Cook v. Corbett,* supra (446 P2d 179), an untrue statement to be in violation of the Corrupt Practices Act must be deliberately false, i.e., the candidate must have known that the statement was false, or that he must have uttered it without regard to whether it was true or false. The statements in the press release were not made with such knowledge or attitude.

The judgment of the lower court is reversed with costs to the contestee.

## ON MOTION TO STAY MANDATE

Leo Levenson and Robert B. Duncan, Portland, for the motion.

PER CURIAM.

The contestant has moved for an order staying the issuance of the mandate of this court to enable him to apply for a writ of certiorari to the United States Supreme Court. His motion does not state the grounds upon which he intends to base his application.

The United States Supreme Court can only grant a petition for writ of certiorari to this court if the Federal Constitution or a federal statute is in issue. Neither in the trial court nor in the initial brief or arguments in this court did the contestant base his cause upon the Federal Constitution or a federal statute. In his petition for rehearing contestant for the first time contends that his federal constitutional rights were violated. Contrary to the statement in the petition for rehearing, this court did not base any part of its decision upon the Constitution of the United States.

In *State v. Buck,* 239 Or 577, 581, 398 P2d 176, 399 P2d 367 (1965), the party moving for a stay of our mandate also had not raised a constitutional issue until his petition for rehearing. We observed that the United States Supreme Court does not hear constitutional questions that are not timely raised in the state court. We denied the motion in *State v. Buck,* supra, "for the reason that we do not 'deem it a reasonable

possibility that a petition for certiorari would be granted.' *Rowe v. Maine,* Misc No. 342, 1960 Term, Aug 25, 1960 (Frankfurter, J.). Accord, *Scott v. Platt,* 171 Or 379, 401, 135 P2d 769, 137 P2d 975 (1943)." 239 Or at 582. We consider that to be true in the instant case.

Motion denied.