Argued and submitted April 7, affirmed December 28, 1983

# COMMITTEE OF ONE THOUSAND TO RE-ELECT STATE SENATOR WALT BROWN,
*Petitioner on review,*

*v.*

# EIVERS,
*Respondent on review.*

## (CA A21758; SC 29290)

674 P2d 1159

Gary M. Berne, of Stoll & Stoll, P.C., Portland, argued the cause and filed a brief for petitioner on review.

Arthur Knauss, Milwaukie, argued the cause for respondent on review. With him on the brief was Redman, Carskadon, Knauss & Kelley, Milwaukie.

PETERSON, C. J.

Lent, J., concurring opinion.

Linde, J., concurring opinion.

## PETERSON, C. J.

Plaintiff is a political committee[1] organized to support the election of Walt Brown to the state senate. It brought this action seeking compensatory damages, punitive damages, attorney fees and costs for violation of ORS 260.532, an election offense statute. A jury awarded plaintiff compensatory damages of $384.12 and punitive damages of $2,500. Defendant appealed.

On defendant's appeal, the Court of Appeals reversed, holding that the plaintiff was not an "aggrieved" party under ORS 260.532(4) because the published statements at issue in the case referred to the candidate it supported, not to the committee. *Comm. of 1000 v. Eivers,* 61 Or App 107, 655 P2d 623 (1982).

### I - THE STATUTE

The statute applicable to this case, ORS 260.532,[2] contains nine subparts, four of which are involved in this appeal. ORS 260.532(1) prohibits making false statements of material fact about a candidate, political committee or measure. It provides:

"(1)  No person shall write, print, publish, * * * any letter, circular, bill, placard, poster or other publication or communication, * * * knowing such letter, circular, bill, placard, poster, communication, publication or advertisement to contain any false statement of material fact relating to any candidate or political committee * * *."

ORS 260.532(4) creates the right of action in these words:

"(4)  Any candidate or political committee aggrieved by a violation of subsection (1) of this section shall have a right of action against the person or persons alleged to have committed the violation. * * *"

---

[1]ORS 260.005(11) (1977) defines a "political committee" as follows:

"(11) 'Political committee' means a combination of two or more individuals, or a person other than an individual, the primary or incidental purpose of which is to support or oppose any candidate, measure or political party, and which has received a contribution or made an expenditure for that purpose."

[2] The statute that was in effect during the 1978 election has since been amended. Unless otherwise stated, all references are to the statute in effect in 1978.

Subsection (6) concerns standing of a political committee. It provides:

"(6)  A political committee has standing to bring an action provided by subsection (4) of this section as plaintiff in its own name, if its purpose as evidenced by its preelection activities, solicitations and publications has been injured by the violation and if it has fully complied with the provisions of this chapter * * *."

Subsection (5) lists items of recoverable damage:

"(5)  Except as provided in subsection (6) of this section, a plaintiff who prevails in an action provided by subsection (4) of this section shall recover punitive damages and attorney fees and also may recover general damages if any have been suffered but proof of general damages is not required for recovery of punitive damages and attorney fees. * * *"

## II - THE STATEMENTS

Walt Brown and defendant were opposing candidates for election to the Oregon State Senate in 1978. During the latter portion of the campaign, defendant distributed brochures which contained the following statements:

"Property Tax--In 1977 W. Brown introduced SJR 52, which would have established a new statewide property tax."

"* * * [A]t a time when the people were clearly saying they wanted LOWER PROPERTY TAXES, George's opponent introduced legislation to add a new, state-wide property tax."

The statements referred to Brown's sponsorship of Senate Joint Resolution 52 (SJR 52) during the previous session of the Oregon Legislative Assembly. SJR 52 was a proposal that a constitutional amendment be submitted to a vote of the people. It provided, in its entirety:

"Paragraph 1. The Constitution of Oregon is amended by creating a new Article to be known as Article XI-I and to read:

"Article XI-I

"Section 1. In the manner provided by law and notwithstanding the limitations contained in sections 7 and 8, Article XI, of this Constitution, the credit of the State of Oregon may be loaned and indebtedness incurred in an amount not to exceed, at any one time, one percent of the true cash value of all taxable property in the state for the purpose of creating a fund, to be known as the "Dental Care Fund" to be advanced as loans to citizens of this state regardless of income level or

other assets to pay for dental care. Loans shall be made at _____ rate of interest.

"Section 2. *Ad valorem taxes shall be levied annually upon all taxable property within the State of Oregon in sufficient amount to provide, together with the revenues, gifts and grants from the Federal Government for the payment of indebtedness incurred by the state and the interest thereon. The Legislative Assembly may provide other revenues to supplement or replace such tax levies.* [Emphasis added.]

"Section 3. Bonds issued pursuant to section 1 of this Article shall be the direct obligations of the state and shall be in such form, run for such periods of time, and bear such rates of interest, as shall be provided by law. Such bonds may be refunded with bonds of like obligation.

"Section 4. The Legislative Assembly shall enact legislation to carry out the provisions of this Article.

"Paragraph 2. The amendment proposed by this resolution shall be submitted to the people for their approval or rejection at the next regular general election held throughout this state."

## III - PROPER PARTY

We first consider whether the committee has a right of action. The Court of Appeals denied recovery saying that "the aggrieved party is the party about whom the false statement of material fact has been made, not the party, if any, that has been damaged financially." 61 Or App at 110. For authority, it cited dictum from our opinion in *Comm. to Retain Judge Tanzer v. Lee*, 270 Or 215, 220 n 2, 527 P2d 247 (1974):

"Although not raised by the parties, a question exists as to whether the Committee to Retain Judge Jacob Tanzer is the proper party to bring the action in this case in the absence of an allegation that something false was said about the Committee. * * *

"It is possible for a candidate to have a political committee in each of the 36 counties. It is doubtful that the legislature intended to give each committee a cause of action for the same alleged false statement about their candidate, nor that a successful candidate who won 35 such cases and lost one should thereby lose the nomination.

"The fact that subsection (6) of ORS 260.532 gives a political committee standing to bring an action assures that

the committee instead of all of its members will have the legal standing to sue in the event that a false statement is made about it."

■ We are not persuaded by the dictum in *Tanzer*. ORS 260.532(4) grants a cause of action to "[a]ny candidate or political committee aggrieved by a violation of subsection (1) * * *." ORS 260.532(6) authorizes a political committee to sue in its own name "* * * if its purpose as evidenced by its preelection activities, solicitations and publications has been injured by the violation * * *." In this case, the committee's sole purpose was identical to the candidate's purpose: to re-elect State Senator Walt Brown. Where the political committee's purpose is essentially identical to the candidate's, an actionable false statement regarding the candidate may cause injury to the committee as well.[3] In this case, any injury to its purpose arising from the allegedly false statements made concerning its candidate was of the same nature as that sustained by its candidate. The committee was providing money to secure Brown's election. There is evidence that it expended money to counter the statements quoted above. Under the circumstances of this case the legislation confers upon political committees the very remedy invoked by the plaintiff.[4] We hold that the plaintiff committee was an aggrieved party under ORS 260.532 to bring an action for a false statement about its candidate.

---

[3] Additionally, we infer a legislative intent that we construe the statutory standing requirements liberally because this civil remedy replaced the former criminal sanctions. In essence, such plaintiffs function much like private attorneys general as their suits effectuate the underlying purpose of the Act to secure and protect the purity of the ballot.

[4] Although, not dispositive of this case, in Oregon Laws 1983, chapter 756, section 1, the legislature added this language to ORS 260.532(6):

"In an action brought by a political committee as provided by subsection (4) of this section, the plaintiff may recover compensatory damages for all injury to the purpose of the committee by reason of a false statement of material fact."

The legislative history explains this language was added in light of the Court of Appeals opinion in this case to make clear that a committee which supported a measure or whose major purpose was to support a candidate may bring an action for false statement. See Hearing on HB 2110 before House Committee on Elections, May 16, 1983 (statement of C. Gregory McMurdo, Deputy Secretary of State). In essence, the new statutory language is a legislative overruling of the Court of Appeals decision. Although we independently reach our conclusion, the legislative action tends to support the conclusion in the text.

## IV - THE MERITS

The more difficult question is whether the statements, under the statute, are "false statements of material fact." The campaign brochures stated that Brown introduced legislation which "would have established a statewide property tax" and that Brown "introduced legislation to add a new statewide property tax."

The defendant claims that he was entitled to a directed verdict because the statements were not false within the meaning of the Corrupt Practices Act.[5] Defendant points out that section 2 of SJR 52 expressly provided that "ad valorem taxes shall be levied annually upon all taxable property within the State of Oregon in sufficient amount to provide, together with the revenues, gifts and grants from the Federal Government for the payment of indebtedness incurred by the state and the interest thereon."

The plaintiff argues that the statements were false because adoption of SJR 52 of itself would neither have established nor added a statewide property tax. For SJR 52 to result in a property tax, plaintiff claims that the following sequence was necessary:

1.  Both houses of the legislature would have had to pass SJR 52 [In fact, neither house passed the measure.];

2.  The measure then would have gone to the voters for approval as a constitutional amendment;

3.  If the electorate approved the constitutional amendment, the legislature would have been required to enact legislation to carry out the provisions of SJR 52;

4.  If enabling legislation were enacted, bonds would be sold to investors;

5.  With the funds received from the sale of bonds, the state would make loans to people who had catastrophic dental care expenses;

---

[5] The defendant has not claimed that ORS 260.532 unlawfully impinges upon his rights under the freedom of speech clauses of the state (Article I, section 8) and federal (First Amendment) constitutions, nor that the law is invalid under Article IV, section 11, of the Oregon Constitution (which makes each house the judge of the elections of its own members).

6. If a high percentage of the borrowers defaulted, the legislature would be forced to draw upon other revenue sources to repay the bondholders;

7. Only if those other revenue sources were inadequate would the legislature levy a statewide property tax.

The plaintiff also argues:

"In sum, SJR 52 did not survive even the first of these steps. Moreover, even if the measure had been passed and implemented and even if there were a shortfall, all of the trial testimony indicated that it would have been extremely unlikely (to the point of political suicide) for the legislature to have enacted a statewide property tax to pay the shortfall. The uncontradicted testimony at trial was that Oregon has not had a statewide property tax since 1941 and that the legislature would cover any shortfall through revenue derived from other sources."

■■ We have held consistently that statements are not "false," as that term is used in ORS 260.532(1), if any reasonable inference can be drawn from the evidence that the statement is factually correct or that the statement is merely an expression of opinion. The mere possibility of an inference of falsity does not confer a right of action under ORS 260.532 if the evidence may also give rise to a reasonable inference of correct fact or to a reasonable inference that the comment is the expression of an opinion. *Thornton v. Johnson,* 253 Or 342, 362, 453 P2d 178, 454 P2d 647 (1969); *Mosee v. Clark,* 253 Or 83, 87, 453 P2d 176 (1969).

As stated, plaintiff's principal contention is that defendant's statements are false because the passage of SJR 52 would neither have "established" nor "added" a new statewide property tax. In determining whether any inference can be drawn that the defendant's statements were correct statements of fact we examine the words in question to see whether, in any accepted way, the words can be said to be factually correct.

To the degree that the defendant's statements imply a permanent enactment, they are false. In this sense, the passage of SJR 52 by the legislature, *of itself,* would have established no statewide property tax. The passage of the constitutional amendment by the voters, *of itself,* would have neither put in place nor added a new, statewide property tax.

In fact, even if SJR 52 had been passed by the legislature, the constitutional amendment had been approved by the voters, and the legislature subsequently had enacted a statewide property tax to fund it,[6] one could argue with equal validity that the subsequent enactment of the tax measure, *of itself,* did not establish or add a statewide property tax. Taken collectively, the sequence above unquestionably would have established or added a statewide property tax. The issue remains whether such an assertion reasonably can be made about the initial step, SJR 52.

■     The most common meaning of the word "establish" has connotations of permanency. For example, Webster's Third New International Dictionary 778 (1971) defines "establish" as follows: "1. To make stable or firm; * * * to found or base securely; * * * 4. To bring into existence * * * usually as permanent or with permanence in view * * *." However, Webster's New World Thesaurus 202 (1971), contains this entry: **"establish,** v. **1.** [To set up in a formal manner] — *Syn.* institute, found, *authorize."* (Emphasis added.) Ballentine's Law Dictionary 417 (3d ed 1969) contains this entry: "establish — to originate; to create; to found and set up; * * *." Webster's Third New International Dictionary 24 (1971), states that "add" can mean nothing more than "include." Because we are reluctant to become censors or arbiters of usage in political campaigns and cannot say that it is unreasonable to infer that the language of section 2 of SJR 52 would have established or added a statewide property tax, at least in the sense that SJR 52 "authorized," "included," or "set up" one, we are required to hold that the statute was not violated.[7]

This case parallels *Committee to Retain Judge Tanzer, supra.* That case involved an election contest between an incumbent Court of Appeals judge, Jacob Tanzer, and Jason Lee. The Committee's complaint alleged:

"III

"During the period of May 24, 1974 to May 28, 1974, the date of the election, defendant published and communicated

---

[6] SJR 52 does not, by its terms, require the issuance of bonds.

[7] The Legislative Counsel's office summarized SRJ 52 as follows: "requires ad valorem taxes to be levied upon all taxable property within state for payment of indebtedness incurred by state for fund."

advertising material through newspapers and radio within the state of Oregon which defendant knew contained false statements of material facts relating to the candidacy of Jacob Tanzer and to the plaintiff as follows:

" '$72,000.00

" 'On 2-29-74 my opponent, *the present Judge* decided that $72,000.00 should be paid from *your hard-earned* TAX DOLLARS for attorney's fees in a condemnation case. On 5-11-74 the law firm that received this money made a $200.00 contribution to the present Judge's campaign. (LEE accepts NO CONTRIBUTIONS.)'

"Said publication was false in that the present judge, Jacob Tanzer, did not decide the amount of attorneys' fees that were awarded in the case. This decision was made by the trial court. The award was affirmed by the Oregon Court of Appeals, of which Judge Tanzer was only one member. The affirming opinion did not decide the amount that should be paid; it held only that the Court of Appeals was without power to modify the trial court's award in that case. Defendant knew that his said publication was false."

The *Tanzer* court held:

"* * * * *.

"We believe that the distinctions attempted to be made by the plaintiff are without merit. Judge Tanzer wrote the opinion of the Court of Appeals, and to this extent he 'decided' the case which was under consideration. * * *. Whether the appellate judge is said to have 'decided,' 'held,' 'concluded,' or to have 'written the decision' is only a question of semantics. * * *.

"The same reasoning applies to the plaintiff's contention that the Court of Appeals did not decide the amount of attorney fees to be paid in the condemnation case. * * * The statement in the published advertisement was not false.

"* * * * *.

"The most that could be said about defendant's advertisement that Judge Tanzer 'decided' and that attorney fees 'should be paid' as a result of the decision of the Court of Appeals is that the statements were ambiguous and might have permitted an erroneous inference to have been drawn therefrom. This court in *Mosee v. Clark,* 253 Or 83, 453 P2d 176 (1969), held that such an ambiguous statement, or the possible erroneous inference to be drawn therefrom, did not

constitute a violation of the Corrupt Practices Act." 270 Or at 217-20.

Chief Justice O'Connell dissented saying:

"The statement that Judge Tanzer decided that $72,000 *should* be paid for attorney's fees is true in one sense and false in another. A large number of people in this state do not know how an appellate court operates and it is possible that some of the voters were led to believe that Judge Tanzer, either acting individually or as a part of a collegial court, had the authority to decide how much attorney's fees should be paid in a particular case. * * *" 270 Or at 223. (Emphasis in original.)[8]

As in *Tanzer,* Eivers' statements are "true in one sense and false in another." 270 Or at 223. Because an inference reasonably can be drawn that the statements were not false, ORS 260.532 has not been violated. The defendant's motion for directed verdict should have been allowed. We therefore affirm the Court of Appeals albeit for different reasons.

The decision of the Court of Appeals is affirmed.

**LENT, J.,** concurring.

I concur in the result reached by the majority and, for the most part, by far, the opinion. The majority opinion

---

[8] The main reason for Chief Justice O'Connell's dissent was his belief that, consistent with the tort rule applicable to fraud and misrepresentation, if an ambiguous statement is capable of two meanings, one true, one false, the jury should decide which meaning is understood for the true one. 270 Or at 222-23. In the context of regulating political speech, we again reject that analysis. We recognize that this holding gives the term "false statement of material fact" a restrictive meaning. In the context of this legislation's potential impact on political speech, we believe such a construction is appropriate. *Compare Thornton v. Johnson,* 253 Or 342, 348, 453 P2d 178, 454 P2d 647 (1969) (the impact of the Act requires the provisions be strictly construed).

This comment from **Oregon Survey,** Judicial Developments 1974, 54 OLR 372, 454-55 (1975), is apposite:

"Hyperbole and circumlocution traditionally have characterized the selling of politicians and products in America. Understandably, therefore, courts hesitate to divine the line separating the hyperbole from a false statement of material fact in a human endeavor in which overstatement has become commonplace. Justice Howell's opinion reflects this honest reluctance to act except when an obvious untruth is published. To act sooner, even in the most controversial cases, would expose the courts to a biennial onslaught of defeated candidates carrying copies or recordings of their opponents' political advertisements, radio blurbs, or public statements that tread the fine line between hyperbole and untruth."

speaks in terms of an "inference" of falsity. See, 296 Or at 202, 674 P2d at 1163 (1983). I do not believe that our reasons for the result reached should be couched in terms of inference. I join the majority because I understand the opinion to be saying that if the *meaning* of the challenged statement of the candidate can reasonably be interpreted to be something other than false, the statement is not cause for action under the statute.

I do not disagree with the separate opinion of Justice Linde, but I think the red flag is raised sufficiently by footnote 5 of the majority opinion.

**LINDE, J.,** concurring.

I join in the court's opinion, but a caveat seems in order. The fact that the court has adjudicated a number of claims under the statute forbidding the publication of falsehoods about political candidates does not imply that the statute itself is constitutional. That has not been decided. The court has not been asked to match ORS 260.532, which now begins with the words: "No person shall cause to be written, printed, published * * *." against Oregon's guarantee that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever * * *." Or Const Art I, § 8.[1]

The court's opinion makes clear, nevertheless, that free speech considerations bear heavily on its interpretation of this statute. If this were an unfair trade practices act such as ORS 646.608, only a die-hard commitment to *caveat emptor* could explain the court's definition of a falsehood. But a

---

[1]The concluding words, "but every person shall be responsible for abuse of this right," have been held to save the civil remedy for injuries to reputation which itself is guaranteed by Or Const Art I, § 10. *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979). ORS 260.532 is not confined to defamatory or even critical statements about a candidate, nor to a remedy for injury to reputation.

The court has stated that some historically established crimes and torts, such as fraud, would survive the prohibition against any law directed in terms against the substance of speech or writing, if the guarantees of 1859 and their 18th century precursors demonstrably were not intended to bar them. *State v. Robertson,* 293 Or 402, 412, 649 P2d 569 (1982), *see State v. Spencer,* 289 Or 225, 228, 611 P2d 1147 (1980). Of course, freedom of political criticism and its role in a "Republican Form of Government," U.S. Const Art IV, § 4, were the chief objects of these guarantees. *See also Deras v. Myers,* 272 Or 47, 535 P2d 541 (1975).

political election is not identical to the commercial marketplace in principle, despite all efforts devoted to making it so in fact.

Given the political toxicity of the word "tax," a legislator who sponsors any bond-financed program that, under the most unlikely circumstances, could be paid off by levying a new tax can expect to be attacked as if that single, unlikely possibility were the chief object of the proposal. Of course it is hyperbole to assert that the routine reference to a state property tax in Senator Brown's proposed constitutional amendment "would have established a new statewide property tax." The same provision appears in eight similar programs placed into our Constitution without such a tax in fact being employed. *See* Or Const Art XI-A, § 4; Art XI-E; Art XI-F(1), § 3; Art XI-G, § 3; Art XI-H, § 4; Art XI-I(1), § 4; Art XI-I(2), § 2; Art XI-J, § 4. But these provisions authorize such a tax when the legislature fails to provide other sources of repayment. In a political campaign, to say that such a provision "would establish" a tax may be a highly exaggerated statement of opinion, but I concur in the decision that it is not a "false statement" within the meaning of ORS 260.532.