In the Matter of the Appeal from an Order of the North Dakota Tax Appeals Board granting an Application for Abatement of Taxes of United Power Association and Cooperative Power Association, Elk River, Minnesota, and Minneapolis, Minnesota, Respectively.

UNITED POWER ASSOCIATION and Cooperative Power Association, Applicants and Appellants,

v.

BOARD OF COUNTY COMMISSION-ERS, McLEAN COUNTY, North Dakota, Respondent and Appellee,

and

State of North Dakota; Byron Dorgan, State Tax Commissioner; Allen I. Olson, Attorney General; Washburn School District No. 4; Washburn Rural Fire Protection District; Board of County Park Commissioners of McLean County; and Garrison Diversion Conservancy District; Additional Parties Pursuant to N.D.C.C. § 57–23.1–02, as amended; Respondents and Appellees.

Civ. No. 9783.

Supreme Court of North Dakota.

Nov. 21, 1980.

Rehearing Denied Dec. 19, 1980.

Paul G. Kloster and James D. Geyer, of Mackoff, Kellogg, Kirby & Kloster, Dickinson, for applicants and appellants.

John Romanick, State's Atty., Washburn, and Kenneth M. Jakes, Sp. Asst. Atty. Gen., State Tax Dept., Bismarck, for respondents and appellees McLean County and State of North Dakota; argued by Kenneth M. Jakes, Sp. Asst. Atty. Gen., Bismarck.

Michael J. Hinman and Mark Foss, Bismarck, for Basin Electric Power Co–op., amicus curiae (on brief).

VANDE WALLE, Justice.

This is an appeal by United Power Association and Cooperative Power Association (hereinafter "UPA–CPA") from the judgment of the McLean County District Court entered February 20, 1980, reversing an order of the North Dakota Tax Appeals Board which granted UPA–CPA's application for abatement of real property ad valorem taxes assessed by McLean County for 1976 and 1977 against its Coal Creek electrical generating plant. We reverse the district court judgment.

During 1976 and 1977, the Coal Creek facility was under construction. The facility did not commence to produce electrical power until August 1979. McLean County, for 1976 and 1977, assessed, as omitted property pursuant to Chapter 57–14, N.D. C.C., the land upon which the facility was located and the improvements thereon, and real property ad valorem taxes were levied against the property.

The land was assessed at $2,280 for 1976 and $16,000 for 1977. UPA–CPA does not dispute the assessment of taxes on the land.

For 1976, the assessed value of the improvements on the land, which consisted of four buildings, was $42,294. For 1977, the assessment of the improvements included a value for the generating station and related facilities in the amount of $6,750,000. This resulted in a total tax on the improvements for 1977 in the amount of $599,933.04.

Although no tax was levied against the facility for 1978, the facility was assessed at $12,656,000 with a potential tax burden of $1,115,057.

UPA–CPA paid the 1976 tax under protest and then made application for an abatement with the McLean County Board of County Commissioners (hereinafter "McLean County"). UPA–CPA did not pay the 1977 taxes but also filed an application for abatement of those taxes with McLean County. Both applications for abatement

were rejected by McLean County by order dated May, 2, 1978. UPA–CPA then appealed the board's decision to the North Dakota Tax Appeals Board.

The Tax Appeals Board determined that from the commencement of construction the Coal Creek facility was a "coal conversion facility" as defined under Chapter 57–60, N.D.C.C., classified as personal property exempt from all ad valorem taxes. Accordingly, the Tax Appeals Board entered an order abating all taxes assessed against the Coal Creek facility by McLean County for 1976 and 1977 with the exception of those taxes assessed on the land.

McLean County appealed from the Tax Appeals Board's order to the district court. The district court concluded that during the period of construction the Coal Creek facility did not constitute a "coal conversion facility" under Chapter 57–60, N.D.C.C., and therefore was not exempted by that chapter from ad valorem taxation by the County. Accordingly, the district court reversed the order of the Tax Appeals Board.

UPA–CPA has now appealed to this court from the district court's judgment. Although UPA–CPA has raised a number of issues on appeal, we believe the following issue is dispositive:

> Whether or not the Coal Creek electric generating facility was a "coal conversion facility" under Chapter 57–60, N.D.C.C., during the period of its construction, so as to be exempted, under Section 57–60–06, N.D.C.C., from all ad valorem taxes.

Chapter 57–60, N.D.C.C., enacted by the 1975 Legislature, imposes upon the operator of each "coal conversion facility" an annual tax for the privilege of producing products of such coal–conversion facility. The provisions of that chapter pertinent to the issue raised on this appeal are Sections 57–60–01(2)(b) and 57–60–06, N.D.C.C., which provide:

> "57–60–01. DEFINITIONS. . . .
>
> "1. . . .
>
> "2. 'Coal conversion facility' means either:
>
> "a. . . .

"b. An electrical generating plant, together with all additions thereto, which processes or converts coal from its natural form into electrical power and which has at least one single electrical energy generation unit with a capacity of one hundred twenty thousand kilowatts or more."

"57–60–06. PROPERTY CLASSIFIED AND EXEMPTED FROM AD VALOREM TAXES–IN LIEU OF CERTAIN OTHER TAXES–CREDIT FOR CERTAIN OTHER TAXES. *Each coal conversion facility shall be classified as personal property and shall be exempt from all ad valorem taxes except for taxes on the land on which such facility is located. The taxes imposed by this chapter shall be in lieu of ad valorem taxes on the property so classified as personal property.* The taxes imposed by this chapter shall also be in lieu of those taxes imposed by chapters 57–33 and 57–33.1 on cooperative generating plants that qualify as coal conversion facilities as defined in this chapter for gross receipts derived from the operation of such plants on or after July 1, 1975. Each cooperative electrical generating plant shall receive a credit against the taxes imposed by this chapter for any taxes imposed pursuant to chapters 57–33 and 57–33.1 and payable after July 1, 1975. Such credit shall apply only for such taxes actually paid, and shall be applied against the taxes imposed by this chapter in the years in which such payments are made." [Emphasis added.]

The parties do not dispute the fact that the Coal Creek facility, upon commencement of production, is a coal–conversion facility as defined under Chapter 57–60, N.D.C.C., which is exempt from all ad valorem taxes by virtue of Section 57–60–06, N.D.C.C. However, McLean County asserts that prior to the commencement of production (i. e., during the construction period) the Coal Creek facility was not a coal–conversion facility under Chapter 57–60, N.D.C.C., and during that period of time was not classified as personal property exempt from ad valorem taxes by virtue of Section 57–ment of construction the Coal Creek 60–06, N.D.C.C. The contrary position is asserted by UPA–CPA: that from the commencement of construction the Coal Creek facility was a coal–conversion facility under Chapter 57–60, N.D.C.C., exempt from all ad valorem taxes.

■ This court has been asked to resolve the issue raised by construing the pertinent provisions of Chapter 57–60, N.D.C.C. In a case such as this we will independently construe the statutory provisions involved to determine whether or not the decision of the Tax Appeals Board is in accordance with the law. See *N. D. Conf. A. of 7th–D. Adv. v. B. of C. Com'rs*, 234 N.W.2d 912 (N.D.1975).

Section 57–60–06, N.D.C.C., is clear and unambiguous in that, except for the land on which it is located, a coal–conversion facility is classified as personal property and is exempt from all ad valorem taxes. On its face, Section 57–60–01(2), N.D.C.C., which defines "coal conversion facility," also appears to be unambiguous, but an ambiguity manifests itself when one considers the issue of whether or not an electrical generating plant *under construction* is included within that definition. There is no reference in the provision to plants under construction nor to the necessity that a plant commence production as a requisite to being deemed a coal–conversion facility. Thus a rational interpretation could be made in support of the view that a plant must commence *production* in order to be deemed a coal–conversion facility as well as in support of the view that upon commencement of *construction* a plant is deemed to be a coal–conversion facility. The ambiguity of Section 57–60–01(2), N.D.C.C., requires us to resort to appropriate rules of statutory construction.

Section 57–60–01(2)(b), N.D.C.C., defines a "coal conversion facility" as an electrical generating plant "which processes or converts coal from its natural form into electrical power ..." Basing its position upon such language, McLean County asserts that a plant must commence processing or converting coal in order to fit within the classi-

fication of a coal–conversion facility. UPA–CPA asserts that a phrase "processing or converting" is merely descriptive of what the plant will, or is intended to, accomplish and that such phrase was not intended to require the actual production of electrical power as a condition precedent to classification as a coal–conversion facility. We are of the opinion that both interpretations are rational and plausible and that the language referred to does not favor one interpretation over the other. We therefore must employ rules of statutory construction and other extrinsic aids to determine its true meaning.

■ With regard to the interpretation of a tax–exemption statute, this court has recognized the rule that the claimant of a tax exemption must establish the exempt status of his property and the tax–exemption statute involved will receive a strict construction against the claimant. *North Dakota Soc. for Crippled Child. & Ad. v. Murphy*, 94 N.W.2d 343 (N.D.1959). However, this court has also recognized and applied the rule that words describing the object of a tax exemption will be given a liberal and not a harsh or strained construction to obtain a reasonable result effectuating the legislative intent in providing a tax exemption. *N. D. Conf. A. of 7th–D. Adv. v. B. of C. Com'rs, supra; Lutheran Camp. Coun. v. Board of Co. Com'rs, Ward Co.*, 174 N.W.2d 362, 363 (N.D.1970). In *Lutheran, supra*, this court quoted and applied the following rule enunciated by the Supreme Court of Nebraska:

"The theory that the rule requiring strict construction of a tax exemption statute demands that the narrowest possible meaning should be given to words descriptive of the objects of it would establish too severe a standard. A liberal and not a harsh or strained construction is to be given to the terms 'educational,' 'religious,' and 'charitable' in order that the true intent of the constitutional and statutory provisions may be realized. The judicial interpretation of such statute should always be reasonable." 174 N.W.2d at 366.

■ We believe it is appropriate to apply the foregoing rule in our interpretation of Chapter 57–60, N.D.C.C., regarding the exemption of a "coal conversion facility" from ad valorem taxation. The definition of "coal conversion facility" urged by McLean County, which would exclude plants under construction, constitutes a narrow and strained interpretation of the defining language. Such a restrictive and technical definition is not warranted by the language used in the statute and is contrary to the foregoing rule of construction which requires a liberal interpretation of the language describing tax–exempt objects. Applying a liberal construction, rather than a harsh or strained one, we conclude that the term "coal conversion facility" encompasses a plant under construction prior to commencement of operation.

In support of our interpretation of Chapter 57–60, N.D.C.C., we believe it is instructive to consider the similar legislation of Chapters 57–33 and 57–33.1, N.D.C.C., and the administrative interpretation of those chapters. See *Coulter v. Ramberg*, 79 N.D. 208, 55 N.W.2d 516 (1952); 2A Sutherland *Statutory Construction*, § 53.03 (1973).

Chapter 57–33, N.D.C.C., imposes a tax upon the gross receipts of cooperative electrical–energy generating plants in which each unit has a generating capacity equal to or less than 100,000 kilowatts. Section 57–33–04, N.D.C.C., provides that the tax imposed by that chapter is in lieu of any other taxes levied on the personal property of such cooperatives.[1]

Chapter 57–33.1, imposes a franchise tax upon the gross receipts of cooperative elec-

1. Section 57–33–04, N.D.C.C., provides, in relevant part:

"57–33–04. TAX IMPOSED IN LIEU OF PERSONAL PROPERTY TAX–PRIVILEGE TAX IMPOSED BY CITY.–

"1. The tax commissioner shall levy on each cooperative a tax upon its gross receipts for the preceding calendar year. Each year for the first five years during which such cooperative is engaged in business the tax shall be one percent and thereafter the tax shall be two percent of its gross receipts. For the purpose of determining when the two percent rate shall be applied, the first year the cooperative is engaged in business shall be the first year in which the cooperative was en-

trical–energy generating plants having at least one unit with a generating capacity in excess of 100,000 kilowatts. Subsection 1 of Section 57–33.1–02 provides that the taxes levied by that subsection are in lieu of any ad valorem taxes upon personal property of an electrical–energy generating plant.[2]

Neither Chapter 57–33, N.D.C.C., nor Chapter 57–33.1, N.D.C.C., expressly exempts plants under construction from ad valorem taxes. Nevertheless, it is undisputed that ad valorem taxes have never been assessed against any facility subject to those chapters, during its construction. The practical administrative construction placed upon those chapters in this regard is supportive of our interpretation of Chapter 57–60, N.D.C.C., that coal–conversion facilities under construction are exempt from ad valorem taxes. We believe that the enactment of Chapter 57–60, N.D.C.C., subsequent to the enactment and administrative application of Chapters 57–33 and 57–33.1, N.D.C.C., whereby plants under construction have been deemed exempt from ad valorem taxes, is indicative of a legislative intent to also exempt from such taxation "coal conversion facilities," as defined by Chapter 57–60, N.D.C.C., during construction.

The judgment of the district court is reversed.

ERICKSTAD, C. J., and PEDERSON, PAULSON, and SAND, JJ., concur.

gaged in business prior to April first of that year. The tax hereby imposed shall be in lieu of any other taxes levied on the personal property of such cooperatives."

2. Section 57–33.1–02, N.D.C.C., provides, in part:

"57–33.1–02. IMPOSITION OF TAXES–IN LIEU OF AD VALOREM TAXES. Each cooperative operating an electrical energy generating plant shall pay an annual franchise tax for the privilege of operating such plant, which shall be computed and determined according to the following procedures:

"1. Each year for the first two years during which a cooperative operates an electrical energy generating plant the tax commissioner, on or before April fifteenth, shall levy a tax of one percent upon the gross receipts derived from the operation of such electrical energy generating plant or plants for the preceding calendar year and thereafter the tax imposed shall be levied upon the gross receipts derived from the operation of such plant or plants at the rate of two percent of the gross receipts. The taxes levied by this subsection shall be in lieu of any ad valorem taxes upon personal property, except transmission lines, of an electrical energy generating plant the gross receipts of which have been subjected to such tax, and the procedures relating to the ad valorem method of levying property taxes shall not be applicable to the taxation of such electrical energy generating plants. For the purpose of determining when the two percent rate shall be applied, the first calendar year in which a cooperative is operating an electrical energy generating plant shall be the first year in which such plant earns gross receipts."