Howard SNORTLAND, Contestant, Appellant and Cross-Appellee,

v.

Joseph CRAWFORD, Contestee, Appellee and Cross-Appellant.

Civ. No. 9906–A.

Supreme Court of North Dakota.

June 8, 1981.

Chapman & Chapman, Bismarck, contestant, appellant and cross-appellee; argued by Daniel J. Chapman, Bismarck.

Wheeler, Wolf, Peterson & McDonald, Bismarck, for contestee, appellee and cross-appellant; argued by David L. Peterson, Bismarck.

PAULSON, Justice.

Howard Snortland appeals from a judgment entered on January 26, 1981, by the District Court of Cass County, which dismissed with prejudice the contest of election action initiated by Snortland against Joseph Crawford. Crawford has cross-appealed from the conclusion of law included in the judgment which determined that a

"false statement" was made, within the meaning of the chapter governing corrupt election practices; and has cross-appealed from the district court's refusal to rule on Crawford's motion to dismiss the action because of the alleged unconstitutionality of certain statutes. We affirm.

In *Ring v. Grand Forks Public Sch. Dist. No. 1*, 483 F.Supp. 272 (D.N.D.1980), the Federal District Court for North Dakota held that § 15–47–10 of the North Dakota Century Code was unconstitutional because it violated the Establishment Clause of the First Amendment to the United States Constitution. Section 15–47–10, N.D.C.C., required that the Ten Commandments of the Christian religion be displayed in places where public school classes convene for instruction. After the Federal District Court had issued its decision, Snortland was notified by the regional counsel for the American Civil Liberties Union that school districts in this State were continuing to display copies of the Ten Commandments in classrooms. Snortland, in his capacity as North Dakota Superintendent of Public Instruction, informed school districts in the State of the decision of the Federal District Court but also informed the school districts that actual enforcement of the decision would rest with local law enforcement agencies.

In addition, several newspapers, including the Minot Daily News and the Fargo Forum, published articles on the *Ring, supra*, decision. The Minot Daily News published an Associated Press release on the subject and the Minot paper carried the headline: "SNORTLAND ORDERS SCHOOLS TO REMOVE TEN COMMANDMENTS." The text of the article as published by the Minot Daily News is as follows:

"SNORTLAND ORDERS SCHOOLS TO REMOVE TEN COMMANDMENTS

"BISMARCK, N.D. (AP)—North Dakota school superintendents will be required to remove the Ten Commandments from classroom walls.

"State Superintendent of Public Instruction Howard Snortland said Thursday the department will address the issue in its March newsletter.

"Snortland said a ruling by District Judge Paul Benson of Fargo makes it illegal to display the biblical material in public schools in North Dakota.

"On Jan. 29, Benson ruled a 1927 state law mandating display of the Ten Commandments was unconstitutional.

"Snortland said school districts will not have the option of voluntarily posting the commandments.

"The decision followed a controversy in the Grand Forks school district. Last spring, Wilma Belcourt, Grand Forks, demanded that the school board comply with the little-known law.

"Four Grand Forks residents filed suit in district court last July, challenging the constitutionality of the rarely enforced law.

"The Grand Forks school board voted last week not to appeal Benson's ruling. Earlier, Attorney General Allen Olson announced the state would not contest the decision."

The Fargo Forum article by the Associated Press was substantially the same, but carried the headline: "SCHOOLS FACE COMMANDMENTS ORDER." The articles were printed in February, 1980.

In a newsletter titled "Outlook", which is published by the Department of Public Instruction, Dr. Lowell Jensen, who was then the Deputy Superintendent of Public Instruction, wrote an article which concerned the Federal District Court's decision, as follows, in pertinent part:

"1. What is the outcome of the district court case involving the posting of the Ten Commandments in elementary, secondary, and college and university classrooms of the public school system?

"The case, heard in the United States District Court, the Northeastern Division, held that the posting of the Ten Commandments in conformity with North Dakota Century Code 15–47–10 is unconstitutional. The court stated that 'The statute fails to meet two of the three criteria

required to withstand the Establishment Clause challenge. It does not serve a secular legislative purpose and it advances religion. Freedom of religion is one of the most important of the individual rights that have been excluded by our Constitution from control or infringement by the Government. Any infringement, however well intended, takes something away from that aspect of our freedom that may never be recovered. Of even more concern, it serves as a basis for further infringement.'

"The case was decided, then, against the Grand Forks School District. The Grand Forks School District had a 30-day period in which to appeal the judgment which was entered on January 28, 1980. Therefore, although the final date for filing an appeal had not passed at the time of this writing, the Grand Forks School Board had publicly announced that they did not intend to file an appeal. If no appeal is filed prior to the expiration of the 30-day period, it then becomes unconstitutional to post the Ten Commandments in North Dakota public school classrooms and schools would be advised to remove the Ten Commandments from their classrooms." [Jensen, *Question-Aired*, OUTLOOK: N.D. Education, March 15, 1980, at 3; re: *Ring v. Grand Forks Public Sch. Dist. No. 1*, 483 F.Supp. 272 (D.N.D.1980).]

Sometime after these articles were published, the Judiciary "C" Committee of the North Dakota Legislative Council for the 46th Legislative Assembly, subsequent to the *Ring, supra*, decision, convened and recommended that legislation be introduced at the 47th Legislative Assembly to allow schools to post the Ten Commandments in school classrooms. No representative from the Department of Public Instruction testified or stated a position on the proposed legislation before such Committee. At this point, Crawford's campaign committee, which was active in seeking to have him elected to the office of Superintendent of Public Instruction, recommended that Crawford address the sensitive political issue of posting the Ten Commandments in

schools and Snortland's actions in relation to this issue.

On or about October 27, 1980, a letter printed and mailed by the North Dakota Republican Party which contained the signature of John M. Sellie, its chairman, was sent to approximately 20,000 people in this State. Sellie revised part of the first paragraph of the letter while Crawford authored the remainder of the contents in the letter. The letter contained the following statements, in pertinent part:

"October 1980

"Dear Neighbor,

"As a rural North Dakota resident, I've witnessed the closing of small schools over the years. Now some rural and small town children ride a school bus up to three hours per day to attend a larger school where the quality of education is no better than at our small schools.

"I am asking you to help Dr. Joe Crawford in his bid for State Superintendent of Schools for three reasons: First, he is committed to fight for the smaller schools. His opponent has spent his career trying to close them down. Now our smaller schools are on the verge of collapse. Crawford will accept the leadership role necessary to keep them viable.

"Second, we need Crawford as State Superintendent because he opposes the present superintendent's call for binding arbitration, which would permit an outside committee to determine what the local school will pay the teachers. This proposal would destroy local control of our schools. Dr. Crawford is against it.

"Third, Crawford feels it to be a serious error for the State Superintendent to order the Ten Commandments out of the schools. Morals in this country are bad enough, and Crawford has pledged to carry on the fight to return the Ten Commandments to the schools.

"Crawford will fight for our schools. Fight for him November 4th.

Best personal regards,
/s/ John O. Sellie
Chairman, North Dakota
Republican Party

"Prepared and paid for by the Republican Party of North Dakota John Sellie, Chairman, Box 1917, Bismarck, North Dakota 58502"

Snortland, the incumbent, and Crawford were candidates for the office of North Dakota Superintendent of Public Instruction. In the general election held on November 4, 1980, Crawford received 154,221 votes, while Snortland received 116,510 votes. A certificate of election was issued on November 19, 1980, and Crawford filed his oath of office on November 25, 1980. Snortland initiated this action on December 3, 1980, by filing a notice of contest of election in which he alleged that Crawford's action in preparing the letter sent on or about October 27, 1980, constituted an "illegal act" within the meaning of § 16–20–22, N.D.C.C., and that Crawford had exceeded the campaign spending limitation set forth in § 16–20–04, N.D.C.C. On December 9, 1980, Crawford submitted an application for a temporary restraining order and a writ of prohibition to this court, in order to prohibit the district court from taking action on the contest of election action. On December 18, 1980, Snortland submitted an application for a temporary restraining order to prohibit Crawford from assuming the office of Superintendent of Public Instruction pending the completion of the contest of election action.

In *Crawford v. Snortland*, 300 N.W.2d 254 (N.D.1980), we declined to accept original jurisdiction over the matter and determined that Crawford could assume the duties of the office of Superintendent of Public Instruction because the State Canvassing Board had determined that he had received the highest number of votes in the general election, and because Crawford had been issued a certificate of election and had filed his oath of office. Subsequently, Crawford assumed the duties of the Superintendent of Public Instruction on January 1, 1981.

At the trial, the deposition of John M. Sellie was read. Sellie's testimony indicated that he prepared only the opening paragraph of the letter. Sellie's role in preparing the letter was limited to revising the opening paragraph after he had received a copy of the proposed letter from Crawford. Crawford testified at the trial as to the basis for the information contained in the fourth paragraph of the letter and on his campaign expenditures:

"Q Now, Mr. Crawford, in the letter then as finally sent out, and you have the copy in front of you, there are three reasons given as to why the people to whom this letter was directed should support your candidacy, is that correct?

"A Yes.

"Q And the third reason is that you feel it to be, excuse me, 'Crawford feels it to be a serious error for the State Superintendent to order the Ten Commandments out of the school?'

"A Schools.

"Q Schools. Now, as far as that sentence is concerned, do you agree that the import of those words is to suggest that Mr. Snortland, the State Superintendent, ordered the Ten Commandments out of the schools?

"A Yes.

"Q That's what you intended?

"A Yes. Uh-hum.

"Q Is that a true statement?

"A I believe it is, yes.

"Q All right. And what is the basis for the validity of that statement? What do you say renders that a true statement?

"A We go back to the Judge's ruling. When our campaign people looked at that. That indicated to me serious concern of that. And that I should make some response. And I did not feel that it was appropriate at that time to make a response. I would wait and see what would be coming out of the Department of Public Instruction. And then on February 22, I believe, thereabouts, Mr. Snortland released a press release through the Associated Press, the heading of which stated, 'Snortland Orders Ten Commandments Out of the Schools.' . . .

"Now, that's the same Associated Press article, Mr. Chapman. But it was two

different newspapers. One was the Minot Daily News. One is, I believe, from the Fargo Forum. In both instances the headline was written that Mr. Snortland in effect ordered the Ten Commandments out of the schools.

.    .    .    .    .

"Now, at that point I still decided to wait and to see what would be happening after that. Now, shortly thereafter, the March Outlook newspaper, which is published by the Department of Public Instruction itself, paid for, printed, written by the staff, was released, included an article by the then Deputy State Superintendent, which quoted the judge's ruling. I don't have a copy of that, Mr. Peterson. But then concluded in the last sentence after quoting the judge's ruling and explaining the judge's ruling stated: 'If no appeal is filed prior to the expiration of the 30 day period,' apparently that's the amount of time allowed to the Grand Forks School District, 'it then becomes unconstitutional to post the Ten Commandments in North Dakota public school classrooms and schools would be advised to remove the Ten Commandments from their classrooms.'

"When that came out, again our campaign committee met and pointed out to me that the federal judge did not say that. Mr. Snortland said that or his deputy said that. In any event, it was a prepared statement from the Department of Public Instruction advising the schoolrooms, advising schools to remove the Ten Commandments from their classrooms. A specific statement from the Department of Public Instruction."

"Q All right. Now, the headline of the Minot article says 'Snortland Orders Schools to Remove Ten Commandments?

"A That's correct.

"Q However, do you find any place in there where Mr. Snortland is quoted as ordering the Ten Commandments out of the schools?

"A Well, I believe, just as I interpreted, I guess, the same way the editors of these two newspapers did. The state-

ment specifically states, and one, two, three, four, the fifth paragraph of the Minot Associated Press article, 'Snortland said school districts will not have the option of voluntarily posting the commandments.' I felt it was a reasonable interpretation that he was saying to the schools, get them down. And I believe it, apparently, that the editors interpreted it the same way or they would not have had the headline reading specifically that he ordered to take the Commandments down.

.    .    .    .    .

"THE WITNESS: I did not consider it to be erroneous. I guess I felt that newspaper editors when they write headlines are writing headlines based on their interpretation of the article. I felt the same way about it from reading that article, from Mr. Snortland's behavior, and from his own article in the Outlook."

"Q Is your campaign or your campaign committee presently in debt for any sum of money?

"A Oh, yes.

"Q How much?

"A I suppose it would come to seven or eight thousand dollars altogether. Where the campaign committee has signed notes to take care of those obligations. I have not myself. Or individuals on the campaign committee have obligated themselves to take care of those commitments. I must say that I'm obligated to the extent to take care of these obligations, which will amount to the entire— that I spent on the entire campaign. The legal obligations.

"Q And what you are saying then, Dr. Crawford, to this Court, is that the total sum of your personal expenditures and obligations that you have incurred is $2,500.00?

"A Yes. Plus—money that was donated to me personally, which was a few hundred more than that. I understand that there may be some question if the obligations of the people who signed notes to pay the indebtedness are not taken care of, I understand there may be some recourse to me personally, but—

"Q   Do you know what the total cost of your campaign was?

"A   Yes.   We had published we had spent about $12,000.00.   That again makes comment that we had incurred about $12,000.00 in expense.   It looks like it will be closer to $18, 19,000."

The judgment entered by the district court decreed that the contest of election action was dismissed with prejudice.   In its conclusions of law, the district court stated, in pertinent part:

## "I.

"The Contestee, Joseph Crawford, did not violate § 16–20–04 of the North Dakota Corrupt Practices Act, in that the Contestant has failed to prove that Joseph Crawford spent an amount of money exceeding 15% of the annual income of the Superintendent of Public Instruction for the State of North Dakota.

## "II.

"That the political advertisement as contained in the mailing co-sponsored by Crawford and the Republican Party of North Dakota contained information containing a false statement.

## "III.

"That [the] said false statement was not knowingly sponsored, inasmuch as Mr. Crawford is not a lawyer, and the Court is satisfied that in this instance the terms 'advised' and 'ordered' could be intermixed.

## "IV.

"That the Contestee, Joseph Crawford, did not knowingly know the statements in the letter to be false, and did not thus knowingly sponsor false statements.

## "V.

"That the Contestant, Howard Snortland's contest of election suit is in all things DISMISSED."

Snortland and Crawford present three issues for our consideration:

1) Whether or not the district court committed error when the court held that the letter mailed by the North Dakota Republican Party and written by Crawford and Sellie contained a false statement.

2) Whether or not the district court committed error when the court held that Crawford did not knowingly sponsor false statements in the letter.

3) Whether the district court committed error when the court failed to decide the constitutional issues raised by Crawford prior to the commencement of the trial.

## I.

The first issue which is presented by Crawford is concerned with whether or not the district court committed error when the court held that paragraph four of the letter contained a false statement in violation of § 16–20–17.3, N.D.C.C., which reads as follows:

"No person shall knowingly sponsor any political advertisement containing false information, whether on behalf of or in opposition to any candidate for public office, initiated measure, referred measure, or constitutional amendment, and whether such publication shall be by radio, television, newspaper, pamphlet, folder, display cards, signs, posters or billboard advertisements, or by any other public means.   Any person who shall violate the provisions of this section shall be guilty of a class A misdemeanor."

Findings of fact made by the trial court are given considerable weight on appeal because the trial court is able to see and hear the witnesses and is thus able to judge their credibility.   *Bosma v. Bosma,* 287 N.W.2d 447 (N.D.1979); *Jahner v. Jacob,* 233 N.W.2d 791 (N.D.1975), *cert. den.,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100. Under Rule 52(a), NDRCivP, the trial court's findings of fact are not set aside unless clearly erroneous.   This court will recognize and consider findings of fact regardless of the label that may be placed upon them by the trial court.   *Matter of*

*Estate of Mehus,* 278 N.W.2d 625 (N.D. 1979). On the other hand, conclusions of law are fully reviewable because they are not fortified by the clearly erroneous rule applicable on appeal to findings of fact. *Northwestern Bell Telephone Co. v. Board of Commissioners of Fargo,* 211 N.W.2d 399 (N.D.1973). However, this court will not disturb a trial court's conclusions of law when they are not wholly inconsistent with the findings of fact made by the trial court and where additional findings based upon unrefuted evidence could have been made to more fully support the trial court's conclusions of law. *Barr v. Barnes County Bd. of County Commissioners,* 194 N.W.2d 744 (N.D.1972).

■ Crawford contends that the district court's finding of fact that paragraph four of the letter contained a false statement was erroneous. Crawford bases his contention upon the fact that the newspaper articles carried headings which referred to an order and that a reasonable interpretation of the article discussing the *Ring, supra,* decision would carry the connotation that Snortland ordered that the Ten Commandments be removed from school classrooms in this State. In addition, Crawford argues that the federal district court did not order that the Ten Commandments be removed from school classrooms but that § 15–47–10, N.D.C.C., violated the First and Fourteenth Amendments to the Constitution of the United States.

We agree with the district court's finding of fact because Snortland never issued a statement or a document ordering that the Ten Commandments be removed from school classrooms. The Associated Press articles and the Outlook newsletter do not mention the word "order." Although the word "order" was not mentioned in the Associated Press release, the headline on the newspaper articles did mention the word "order" and the first paragraph of the article published by the Minot Daily News contains an implication that an order was given to remove the Ten Commandments. The language in the article to the effect that "school superintendents will be re-quired to remove the Ten Commandments from classroom walls" strongly supports the implication.

Although Crawford's contention that the language in the articles and the newsletter may be construed as an order may be reasonable, the fact remains that the direct evidence available to the trial court suggested only one conclusion—that Snortland had advised that the Ten Commandments be removed from school classrooms rather than ordered that they be removed. A conclusion contrary to that reached by the trial court could require that the court engage in speculation and conjecture. Snortland merely advised that they be removed and had the statutory authority to render such advice under § 15–21–07, N.D.C.C. The construction of such advice as an order was solely Crawford's interpretation and this interpretation was false.

Crawford's contention that the words "advice" and order are synonymous is not only technically incorrect but also is not supported by the evidence introduced at the trial. Webster's Third New International Dictionary (Unabridged 1971), pages 32 and 1588, defines the words "advice" and "order." The word "advice" is defined as a "recommendation regarding a decision or course of conduct." The word "order" is defined as "an authoritative mandate usu. [usually] from a superior to a subordinate" or to "require or direct (something) to be done." Thus, the definitions of the words carry their own refutation to Crawford's argument. In addition, at least one school superintendent and the school district which he served did not remove the Ten Commandments after reading the article in the Outlook.

The determination of the truth or falsity of the statement is objective. Thus, Crawford's interpretation of the words "advice" and "order" as being synonymous is not relevant to our analysis of whether or not the statement was false. Crawford contends that statements are not false within the meaning of § 16–20–17.3 if any reasonable inference of opinion or correct fact can be drawn from the statement, and relies

**622**

upon the case of *Thornton v. Johnson*, 253 Or. 342, 453 P.2d 178 (1969) to support this conclusion. See also, *Sumner v. Bennett*, 45 Or.App. 275, 608 P.2d 566 (1980). The rationale of these cases is more applicable to the "knowingly" concept in our situation than to the falsity of the statement. Section 16–20–17.3 contains the culpability requirement of "knowingly," whereas the Oregon statute uses the requirement "with knowledge or with reckless disregard that the letter . . . contains a false statement . . . ." Crawford's contention that the use of the word "order" was reasonable under the circumstances is more appropriately the basis for determining whether or not he "knowingly" sponsored the false statement in violation of § 16–20–17.3.

## II.

█ The second issue which is presented by Snortland is concerned with whether or not the district court committed error when it held that Crawford did not knowingly sponsor a false statement in violation of § 16–20–17.3, N.D.C.C. In order to reach the conclusion that Crawford violated § 16–20–17.3 Snortland must establish that Crawford "knowingly" was the "sponsor" of false information in opposition to a candidate for public office. Snortland contends that the district court's conclusion was erroneous because Crawford knowingly sponsored the false statement even if he acted under the belief that the false statement was in fact true. Crawford contends that § 16–20–17.3 does not apply to him because he is not a "sponsor" of a false statement within the meaning of § 16–20–17.3. Of critical importance to these contentions are definitions of the words "knowingly" and "sponsor" which Chapter 16–20, N.D.C.C. unfortunately does not provide. Where doubt exists as to the meaning of a word, we must resort to rules of statutory construction and other extrinsic aids to determine its true meaning. *United Power Ass'n v. Board of County Commissioners, McLean County*, 300 N.W.2d 36 (N.D.1980). As Mr. Justice Holmes observed in *Towne v. Eisner*, "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, 376 (1918). In *Saefke v. VandeWalle*, 279 N.W.2d 415 (N.D.1979), the court established that the Corrupt Practices Act is penal in nature. For this reason, we attribute to the term "knowingly," as it is contained in § 16–20–17.3, N.D.C.C., the definition of the term as it is contained in § 12.1–02–02, N.D.C.C., which is in the Criminal Code. Section 12.1–02–02(1)(b) defines the term as follows:

"1. For the purposes of this title, a person engages in conduct:

"a. . . .

"b. 'Knowingly' if, when he engages in the conduct, he knows or has a firm belief, unaccompanied by substantial doubt, that he is doing so, whether or not it is his purpose to do so."

We realize that in *State v. North Dakota Education Association*, 262 N.W.2d 731 (N.D.1978), the court held that § 12.1–02–02, N.D.C.C., subsection 2, did not apply to § 16–20–17.2, N.D.C.C., because § 12.1–02–02, N.D.C.C., subsection 2, applied only to the Criminal Code and could not be extended to § 16–20–17.2, N.D.C.C. However, § 16–20–17.3 specifically states the mental culpability requirement of "knowingly" and the Corrupt Practices Act has been construed as being penal in nature. *Saefke v. VandeWalle*, 279 N.W.2d 415 (N.D.1979). In addition, the sensitive First Amendment considerations surrounding all political speech dictate that a stringent mental culpability requirement is applicable here. "Knowingly" in the sense in which it is used in § 16–20–17.3, N.D.C.C. is the mental culpability requirement applicable to the person's awareness of the falsity of the statement which he sponsors. A contrary construction of the term as being applicable solely to the term "sponsor" would render the term meaningless and would violate important constitutional rights.

█ The definition does not measure the conduct prohibited by § 16–20–17.3 in terms

of whether a reasonably prudent person knew or should have known that the statement was false; rather, the sponsor must have had a firm belief, unaccompanied by substantial doubt, in the falsity of the statement. This definition complies with the sensitive First Amendment considerations inherent to all political speech. Although the United States Supreme Court has not ruled on the mental culpability requirement necessary to constitute unprotected false speech in the context where a violation of fair election practices is alleged, it is clear that the false statement which is made negligently is protected speech. Punishing such speech would often inhibit campaign speech because the candidate would remain silent on an issue if he was less than completely certain of the statement's accuracy. See *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Free discussion of political issues is the very essence of the First Amendment.

A useful analogy can be drawn between cases involving the purported defamation of a public official and the circumstances in this case. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court established that the First and Fourteenth Amendments prohibit a public official from recovering damages for a defamatory falsehood relating to official conduct unless the statement was made with actual malice—knowledge that it was false or reckless disregard of whether or not it was false. Later cases have established that the application of the principles enunciated in *New York Times, supra,* is not limited to conventional civil libel suits. *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Greenbelt Cooperative Publishing Assn v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). Thus, the constitutional requirements necessary to impose liability for defamation of a public figure establish a minimum requirement which § 16–20–17.3 must meet.

Snortland presented the following question in his brief, "Can a candidate make a false statement and yet hide behind the fact that he didn't think the words were false?" The answer to the question which Snortland poses in his brief is "yes." Because the standard of the reasonably prudent person is no part of the culpability standard sufficient to impose liability in actions for defamation of a public official, it is difficult to conceive of reasons why the standard should apply in the instant case where the interests at stake involve the viability of the democratic process and a culpability standard of "knowingly" is contained in the statute.

While it may be argued that this standard puts a premium on ignorance, encourages sponsors not to inquire into the truth of their statements, and allows the issue to be decided by a sponsor's testimony that he published the statement in good faith and was unaware of its probable falsity, neither the defense of truth nor the standard of ordinary care would prevent self-censorship and the subversion of First Amendment policies. Undoubtedly, the State interest in preserving the integrity of the election process and allowing the electorate to choose among candidates on the basis of accurate information is of paramount importance. However, the consequences of penalizing the negligent false statement or the false statement made in good faith would prohibit the free exchange of ideas which lies at the very heart of the First Amendment. For this reason, the First Amendment considerations applicable to § 16–20–17.3 are best served by a stringent mental culpability requirement. If the requirements of "actual malice" are necessary to impose liability under criminal defamation statutes such as the Supreme Court established in *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), it is difficult to conclude that an equally stringent safeguard is not necessary in the instant case which also involves a statute which is penal in nature and affects precious rights under the First Amendment far broader that one's reputation.

The word "sponsor" is also of critical importance in determining whether or not

§ 16–20–17.3 has been violated. Crawford admits that he wrote the fourth paragraph of the letter but claims that he was not the sponsor of the letter because the words "sponsor" and "composer" or "author" are not equivalent. The district court held that Crawford and the North Dakota Republican Party were co-sponsors of the letter. Crawford's contention would require a conclusion that the North Dakota Republican Party and its chairman, John M. Sellie, were the sole sponsors of the letter. For the purposes of this case, we believe that the definition of the term sponsor as stated in Burton, Legal Thesaurus (1980), at page 474, is applicable here:

> "accept responsibility for, act as surety for, answer for, assure, back, be responsible for, befriend, certify, champion, defend, endorse, ensure, favor, finance, financier, guarantee, insure, patronize, pay for, promote, protect, provide for, put up the money, secure, stand behind, subscribe to, support, sustain, sympathize, take responsibility for, underwrite, uphold, vouch for, warrant."

Words used in any statute are to be understood in their ordinary sense by virtue of § 1–02–02, N.D.C.C. As we can see from the foregoing definition, the term "sponsor" has many different shades of meaning and it would serve no useful purpose to define it in the abstract. We are satisfied that Crawford, who was a candidate for office and co-authored the letter containing the false statement as well as actively assisted in the promotion and mailing of the letter to a sizeable number of people, comes within the meaning of the term "sponsor."[1]

■ The district court concluded that Crawford did not "knowingly" violate § 16–20–17.3 and we agree with the district court's conclusion of law. The mental culpability requirement of "knowingly" is a strict one. For a violation of § 16–20–17.3 to occur, Crawford must have had a firm belief, unaccompanied by substantial doubt, that the statement in the letter was false.

In fact, the testimony adduced at the trial revealed that Crawford thought the statement was true and this interpretation was reasonable in light of the newspaper articles and other actions surrounding the interpretation of the *Ring, supra*, decision by Snortland.

Snortland asserts that Crawford knew all the facts necessary to determine that the statement was false. However, even if we accept Snortland's contention, a violation of § 16–20–17.3 would not be proved because Crawford's actions, at best, could only be equated to a "reckless" standard of mental culpability. The fine line separating these mental culpability requirements is the phrase "unaccompanied by substantial doubt." When the requirement is applied to the requirement of § 16–20–17.3 that the sponsor "knowingly" insert false information in a political advertisement, it is clear that the sponsor must not only appreciate the probable falsity of the information but must also dispel serious doubts about its truth. The testimony of Crawford indicates that he never considered the statement to be false. The fact that he could have determined that the statement was false is merely an ancillary consideration insufficient to support the conclusion that he knowingly violated § 16–20–17.3. The determination of a witness's credibility was a consideration for the district court. The evidence supported the district court's findings of fact and we cannot conclude that the findings of fact were erroneous.

While the effect of our conclusions, as Snortland contends, may insulate from liability a candidate who has someone else sign and send out a false statement by public means, our concern is directed to language of the statute rather than its consequences. Those who do not fall within the provisions of § 16–20–17.3 are not governed by it and the reach of statutes which may proscribe a candidate's actions, such as

---

1. The parties do not contend that the letter was not a political advertisement or that the action of sending the letters was not within the prov-

ince of the "public means" as contained in § 16–20–17.3, N.D.C.C.

those of Crawford, is more appropriately a matter for the Legislature's consideration.[2]

### III.

■ The final issue is concerned with whether or not Crawford was guilty of a corrupt practice and should be deprived of his office because his campaign expenditures exceeded the limitations provided by § 16–20–04, N.D.C.C., which provides:

"No sum of money shall be paid and no expenses shall be authorized or incurred by any candidate seeking nomination to any public office or position in this state in a primary election campaign or any candidate who has received the nomination to any public office or position and is a candidate in the general election or any candidate in a special election in excess of five hundred dollars or fifteen percent of the annual salary of the office for which he is running, whichever is greater. Such amounts may be incurred for each election. Any candidate who fails to abide by the provisions of this section shall be punished as provided in section 16–20–24."

Crawford's actions as a candidate are governed by § 16–20–22, N.D.C.C., which provides as follows:

"Upon the trial of an action or proceeding under the provisions of this chapter to contest the right of any person declared to be nominated or elected to any office, or to annul or set aside such election, or to remove any person from his office, if it shall appear that such person was guilty of any corrupt practice, illegal act, or undue influence in or about such nomination or election, he shall be punished by being deprived of the nomination or office, as the case may be. Such vacancy shall be filled in the manner provided by law."

Corrupt practices within the meaning of Chapter 16–20, N.D.C.C., are defined as follows in § 16–20–01, N.D.C.C.:

"A person shall be guilty of corrupt practice within the meaning of this chapter, if he:

1. Expends any money for election purposes contrary to the provisions of this chapter;
2. Is guilty of treating;
3. Is guilty of undue influence;
4. Is guilty of impersonation; or
5. Is guilty of the use of state services or property for political purposes."

The expenditure of money for election purposes contrary to the provisions of Chapter 16–20 is a corrupt practice under § 16–20–01 and § 16–20–22, N.D.C.C. The district court concluded that Snortland failed to prove that Crawford spent an amount of money exceeding fifteen percent of the annual salary of the Superintendent of Public Instruction for the State of North Dakota. The person elected in the November 4, 1980, general election to occupy the office of Superintendent of Public Instruction will receive the annual salary of $34,000 under § 15–21–02, N.D.C.C. By virtue of § 16–20–04, N.D.C.C., the upper limit on the amount of money which Crawford could spend in the campaign would be fifteen percent of $34,000 or $5,100. Crawford testified that he spent $2,500 in the campaign but that the actual debt of his campaign totaled $7,000 or $8,000 because he remained obligated to repay loans made during the course of the campaign. In addition, Crawford testified that the actual expense of the campaign would far exceed the limitations imposed by § 16–20–04. When the two-thousand five hundred dollar figure and the amount of the loans for which Crawford may become obligated are combined, it is certain that the fifteen percent limitation on campaign expenses prescribed by § 16–20–04, N.D.C.C., was exceeded.

While the district court viewed the actual expenditure of the candidate's money and the loans on which he remains obligated as being distinct, this conclusion was erroneous because § 16–20–04, N.D.C.C., contains no

---

2. For an example of a statute limiting the action of a candidate see *Sumner v. Bennett*, 45 Or.App. 275, 608 P.2d 566 (1980).

distinction between loans made by a candidate and money actually expended by a candidate from his own funds or those of his campaign committee. The section is concerned only with the amount of the candidate's expenditures over which the candidate has control. Thus, the district court's conclusion of law to the effect that Snortland had not proved that Crawford exceeded the campaign spending limitation provided in § 16–20–04, N.D.C.C., was erroneous. Crawford violated §§ 16–20–01 and 16–20–22, N.D.C.C.

The district court did not rule on Crawford's motion to dismiss Snortland's action and did not issue a decision on the constitutional issues which Crawford raised. Instead, the district court decided the case on alternate grounds which we have concluded were in part erroneous. Thus, the district court committed error by not ruling on the constitutional issues raised by Crawford. No unresolved questions of fact remain to be considered and both Crawford and Snortland have discussed the constitutional questions in their briefs and in oral argument. Because the issue has been preserved for our review and directly affects Crawford's rights, we will consider the issue because it is essential to the disposition of the appeal.

▇ Statutes carry a strong presumption of constitutionality. *Southern Grain Dealers Ass'n v. Board of County Commissioners of Richland County*, 257 N.W.2d 425 (N.D. 1977). For this reason, any doubts as to the constitutionality of a statute must be resolved in favor of the validity of the statute. *Benson v. North Dakota Workmen's Compensation Bureau*, 283 N.W.2d 96 (N.D. 1979); *Dorgan v. Kouba*, 274 N.W.2d 167 (N.D.1979). With these considerations in mind, we will review Crawford's contention that § 16–20–04, N.D.C.C., is unconstitutional.

Crawford contends that § 16–20–04, N.D.C.C., is unconstitutional because it violates the First Amendment to the United States Constitution and Article I, Section 4, of the North Dakota Constitution. In support of his contention, Crawford cites the case of

*Buckley v. Valleo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), in which the United States Supreme Court held that certain provisions of the Federal Election Campaign Act of 1971 which limited independent political expenditures by individuals and groups and fixed ceilings on over-all campaign expenditures by candidates were unconstitutional because they impermissibly burdened the right of free expression under the First Amendment. In addition, the court also held that the provision of the Act which limited the amount of personal expenditures by a candidate was also unconstitutional. The court drew a distinction between the contribution provisions of the Act and the expenditures provisions. The contribution provisions were upheld as appropriate legislative weapons against the reality or appearance of improper influence arising from the dependence of candidates upon large campaign contributions. The contribution ceiling imposed by the Act served the basic governmental interest in safeguarding the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion.

▇ The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble and to petition the government for a redress of grievances." This requirement has been construed as being applicable to the states through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). Political expression has always been one of the preferred rights protected by the First Amendment because the complete exercise of the freedom of speech is essential to the fair operation of the electoral process. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). The First Amendment also protects political association. *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

Section 16–20–04, N.D.C.C., places restrictions upon the amount of money a candidate may spend in 1) seeking nomination to any public office, 2) a primary election campaign, 3) general election campaign, or 4) a special election. The statute imposes restrictions upon expenditures by a candidate rather than upon contributions. The limitation presents a substantial restraint upon political expression during a campaign because it restricts the number of issues which can be discussed and the size of the audience which can be reached, by restraining the expenditure of money which is essential to communicating ideas within our political process. Candidates who raise money in excess of the spending ceiling are nevertheless prohibited from using the excess funds during the course of the campaign or they risk an allegation of having committed a corrupt practice which may result in a candidate being deprived of his office. As an attempt to evade the restriction, candidates, such as Crawford, must resort to a subterfuge, such as a loan obtained by members of a campaign committee, in order to avoid the harsh effect of the statute. We have already determined that a loan for which a candidate remains responsible for payment is an expenditure of money subject to § 16–20–04, N.D.C.C.

The fundamental First Amendment interests of Crawford at stake here require that the restrictions imposed by § 16–20–04 be subjected to closest scrutiny. *NAACP v. Alabama, supra, Smith v. Goquen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). However, an interference with protected rights may be sustained if a sufficiently important state interest is at stake and the restriction is narrowly drawn to avoid unnecessary abridgement of First Amendment freedoms. *Buckley v. Valleo, supra; Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). The State interests which may be urged in support of the restriction include prevention of corruption, prevention of the appearance of corruption resulting from the appearance of a candidate "buying" the office, and equalizing the ability of candidates to participate in the political arena. Although these State interests advance worthy objectives, the interests are not sufficient to justify the infringement of Crawford's fundamental First Amendment rights of free speech and association.[3]

Section 16–20–04 is unconstitutional as violative of the First and Fourteenth Amendments to the United States Constitution and Article I, Section 4, of the North Dakota Constitution because it imposes a substantial restraint upon the ability of a candidate, such as Crawford, to engage in protected expression and imposes arbitrary restraints upon campaign expenditures. The campaign expenditure limitation does not support the State interests which it purports to advance because the provision restricts the candidate's ability to reach a wide audience. The candidate must carefully marshal his resources to conduct the campaign and, in view of today's escalating campaign costs, the electorate is forced to make decisions about candidates without the information necessary for an informed choice between candidates. By imposing a limitation upon spending, the statute actually promotes inequality by foreclosing the ability of a candidate lacking name recognition to reach a wide audience. The effect of the operation of the statute is of such a nature as to remove from the statute the presumption of constitutionality. Thus, the State interests advanced in support of § 16–20–04 form no basis for imposing the substantial restriction on campaign spending; rather, these interests are advanced by other provisions in Chapter 16–20, N.D.C.C., which regulate the actions of candidates and actions of potential contributors to campaigns.

Crawford also contends that § 16–20–22 is unconstitutional as it might apply to constitutionally elected officers under Article V, Section 12, of the North Dakota

---

**3.** Other courts that have discussed the issue have reached a similar result. See Annot. 94 A.L.R.3d 944 (1979).

**628**

Constitution. Crawford contends that § 16–20–22 violates equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article I, Section 21 and Section 22 of the North Dakota Constitution because a non-incumbent challenger who committed a violation under § 16–20–22 could be denied the right to assume office while an incumbent running for re-election could be removed from office only by impeachment pursuant to Article XI, Section 10, of the North Dakota Constitution. In view of our conclusion that Crawford is not subject to removal from office under § 16–20–22, the issue is hypothetical. Because the existence of an actual controversy is necessary to decide an issue, we will not decide the issue which Crawford attempts to raise. *Hospital Services v. Brooks*, 229 N.W.2d 69 (N.D.1975). Because Crawford did not knowingly issue a false statement under § 16–20–17.3, N.D.C.C. and because § 16–20–04 is unconstitutional under the First Amendment to the United States Constitution and Article I, § 4, of the North Dakota Constitution, the judgment of the district court is affirmed and Snortland's contest of election action is dismissed.

SAND and PEDERSON, JJ., HEEN, District Judge, concur.

HEEN and BAKKEN, District Judges, sitting in place of Chief Justice Ralph J. Erickstad and Justice Gerald W. VandeWalle.

PEDERSON, Justice, concurring specially.

Supplemental to the matters covered by Justice Paulson in the majority opinion, which I have endorsed, I feel obliged to express a further comment. Quite naturally, neither party argued nor briefed the subject, nevertheless it is common knowledge that both did actively participate in partisan nomination (endorsement) procedures which are prohibited by law. Section 16–08–04, NDCC, provides in part: "No partisan nominations shall be made for any of the offices mentioned in section 16–08–01."

Offices which are mentioned in § 16–08–01 are: all elective county offices, the office of judge of the supreme court, the office of judge of the district court, the office of superintendent of public instruction, and the office of tax commissioner. Additionally, the office of tax commissioner is declared non-political by Article V, Section 12, of the Constitution of North Dakota.

Section 16–20–22, NDCC, not only prohibits acts which constitute corrupt practices, but also makes all "illegal acts" and "undue influences" which involve nominations or elections, the basis for depriving a guilty person of the nomination or the election, as the case may be. While the terms "nomination" and "endorsement" have different shades of meaning, they are, in practice, frequently interchanged and even the statutory provisions do not always clearly distinguish between them. See generally, Chapter 16–05, NDCC.

Ordinarily, he who seeks equity must come with clean hands. E. g., *Andersen v. Resler*, 57 N.D. 655, 223 N.W. 707 (1929).

SAND, J., and HEEN, District Judge, concur.

BAKKEN, District Judge concurring specially and dissenting.

As stated in the majority opinion: "Undoubtedly, the State interest in preserving the integrity of the election process and allowing the electorate to choose among candidates on the basis of accurate information is of paramount importance". It is my belief that that was the intent and purpose of the legislature for enacting Chapter 16–20, N.D.C.C., as amended, entitled Corrupt Practices, and specifically Section 16–20–17.3, N.D.C.C., as amended.

I agree that the majority has correctly determined that the district court did not commit error when it held that the letter mailed by the North Dakota Republican Party and written by Crawford and Sellie contained a false statement, and that Crawford comes within the meaning of the term "sponsor".

I dissent from the determination by the majority that the district court did not commit reversible error when it held that Crawford did not knowingly sponsor false statements in the letter.

Mr. Crawford is a man with a degree of doctor of philosophy. He has a history of active partisan political activities which includes managing prior campaigns for state office for himself and others. He had complete knowledge of the Order and Judgment of the United States District Court shortly after the Order and Judgment had been signed by Judge Paul Benson, January 28, 1980. During March of 1980 Crawford had complete knowledge of the news letter written by Snortland's deputy. Crawford admitted that he had had conferences regarding the matter with his campaign advisors. He was aware of all facts and deliberately and calculatingly drafted the letter containing the false statement designed to arouse and inflame emotions against Snortland and he mailed it to approximately 20,000 prospective voters in this state during October, 1980, approximately eight days before the November general election. The months that it took to analyze and reach a position on the issue clearly show calculated deliberations. Nevertheless, for all of Crawford's calculated deliberation, he still conveyed false information to the voters. The deliberate calculation of Crawford is further shown by the manner in which the false information was presented to the voters. The false statement of Crawford was placed in the final paragraph of the letter sent to voters. Because the false statement was presented within the last lines of the letter, the voters were more apt to remember the false statement as the main point of the letter, without realizing the falsity in the statement. The late mailing of the letter was the most effective use of the statement. It left the voters little time to weigh the truthfulness of the letter's contents and left no time for Snortland to effectively respond to the false statement the letter contained.

The word "knowingly" applies to the falsity of the statement. It should not be a shield to hide behind in falsely characterizing an opponent's record.

The words in Crawford's letter inaccurately and falsely stated what Snortland had done and failed to advise that whatever he had done was pursuant to the order and judgment of the United States District Court. There is nothing in the record to support a finding that this was not knowingly done as "knowingly" is defined by Section 12.1–02–02(1)(b) of the N.D.C.C., as amended. The judgment should be reversed and Crawford punished by being deprived of the office pursuant to Section 16–20–22, N.D.C.C.

In view of *Buckley v. Valleo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), I concur with the majority decision that Section 16–20–04, N.D.C.C., is unconstitutional because it violates the First and Fourteenth Amendments to the United States Constitution and Article I, Section 4, of the North Dakota Constitution. The majority decision has, in effect, nullified Chapter 16–20 in its entirety.