[No. 32274-9-II.   Division Two.   September 7, 2005.]

MARILOU RICKERT, *Appellant*, v. THE PUBLIC DISCLOSURE
COMMISSION ET AL., *Respondents*.

*Venkat Balasubramani* (of *Newman & Newman, L.L.P.*) and *Aaron H. Caplan* (of *American Civil Liberties Union of Washington*), for appellant.

*Robert M. McKenna, Attorney General*, and *Linda A. Dalton* and *Jean M. Wilkinson, Assistants*, for respondents.

¶1 BRIDGEWATER, J. — Marilou Rickert appeals from the superior court's affirmance of the Washington State Public

Disclosure Commission's (PDC) decision that she violated RCW 42.17.530(1)(a) when she made false statements about Senator Tim Sheldon's voting record in the 2002 general election.

¶2 We hold that the statute violates the first amendment to the United States Constitution[1] in that it is not limited to defamatory speech because it does not require that the candidate be damaged by the false statements. Although the stated intent of the legislature was to "provide protection for candidates for public office against false statements of material fact sponsored with actual malice," the statute does not require any element of damage to the reputation of the maligned candidate. In point of fact, Senator Sheldon does not claim any damage by the alleged false, material, malicious statements, and he won the election by an overwhelming majority. Because the statute is not limited to defamatory speech, the statements are protected speech. We then subject the statute to a strict scrutiny analysis. It fails.

¶3 The statute is not narrowly tailored to advance a compelling state interest. The PDC's interest is in promoting integrity and honesty in the elections process; but the statute, while purporting to punish malicious falsehoods about candidates by their opponents, permits the candidates to proclaim falsehoods about themselves without penalty. Of equal importance, we hold that the statute is unconstitutional in that it is not limited to speech made during election campaigns that causes serious adverse consequences to the public. Thus, the statute is unconstitutionally overbroad in that it would pertain to every false, malicious, material statement whether it constitutes libel or slander, and it permits dishonesty in political speech by candidates. We reverse.

¶4 This case arises from the PDC's sanction of a political candidate under RCW 42.17.530(1)(a), which provides that

---

[1] In pertinent part, the first amendment of the United States Constitution states as follows: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. CONST. amend. I.

it is a violation of chapter 42.17 RCW for a person to sponsor with actual malice "[p]olitical advertising that contains a false statement of material fact about a candidate for public office."[2] This case presents the first reported challenge to that statute.

¶5 During the 2002 election year, Senator Tim Sheldon, the incumbent Democrat, and Marilou Rickert ran against each other for the office of state senator for the 35th Legislative District. Rickert ran as a member of the Green Party.

¶6 Between October 16 and October 28, 2002, Rickert sponsored a political brochure that was mailed to voters in the 35th District. The brochure was mailed in a printed wrapper entitled, "THERE IS A DIFFERENCE!" Administrative Record (AR) at 10. The wrapper compared Senator Sheldon's and Rickert's positions on various issues. The comparison giving rise to this litigation stated:

[Rickert:] Supports social services for the most vulnerable of the state's citizens.

[Sheldon:] Supported revenue measures that have forced reductions in services to the mentally ill, developmentally challenged, and their families; *voted to close a facility for the developmentally challenged in his district* and is advocating for the site to be turned into a prison.

AR at 10 (emphasis added).

¶7 Senator Sheldon was reelected in the November 5, 2002 general election by approximately 79 percent of the vote. On November 19, 2002, Senator Sheldon filed a complaint with the PDC, alleging that Rickert's statement that he had "voted to close a facility for the developmentally challenged" was a false statement of material fact. AR at 13.

¶8 On May 5, 2003, the PDC charged Rickert with violating RCW 42.17.530. The notice of administrative charges alleged that Rickert had "sponsored with actual

---

[2] RCW 42.17.530(1)(a). Under RCW 42.17.505(1), "actual malice" means to "act with knowledge of falsity or with reckless disregard as to truth or falsity."

malice political advertising that contained a false statement of material fact about Senator Tim Sheldon." AR at 33.

¶9 The PDC held a hearing on July 29, 2003. At the hearing, Rickert testified that the "facility" she had referred to in the wrapper was the Mission Creek Youth Camp, which is located within the 35th District near Belfair, Washington. AR at 338.

¶10 In March 2002, the legislature passed the 2002 budget act, which eliminated funding for Mission Creek. Senator Sheldon twice voted against ESSB 6387, the appropriation bill specifically mandating Mission Creek's closure.

¶11 Sally Parker, the PDC investigator assigned to Rickert's case, testified that Rickert's statement was false because Senator Sheldon had not voted in the state legislature to close Mission Creek and because Mission Creek was not a facility for the "developmentally challenged" but for juvenile offenders. AR at 328. Parker stated that she learned that Senator Sheldon had voted against the 2002 budget act by reading "newspaper articles" and by verifying his voting record in the "budget notes." AR at 328. In addition, she contacted administrators in the Department of Social and Health Services (DSHS) and conducted "research on the Internet" in order to verify the character of Mission Creek. AR at 330. Parker further testified that, during her investigation, Rickert had admitted that her characterization of Mission Creek as a facility for the disabled was false.

¶12 David Griffith, the assistant to the division director of institution programs for DSHS, testified that Mission Creek opened in 1961 and was a minimum security institution for juvenile offenders. He stated that Mission Creek's mission was to protect and provide rehabilitation services to juvenile offenders while serving their sentence and that it was "absolutely not" a facility for the developmentally disabled. AR at 342.

¶13 Senator Sheldon testified that he did not vote to close a facility for the developmentally challenged in the 35th District. Additionally, he stated that he had visited Mission Creek "several times" and that it was a medium security facility for juvenile offenders, with "high fences" and "barbed wire." AR at 351.

¶14 Rickert denied having ill will toward Senator Sheldon. She testified that she had based her statements on conversations with a lobbyist and thought that her statements were true when she made them.

¶15 The PDC found that both Rickert's statement that Senator Sheldon had voted to close Mission Creek and that Mission Creek was a facility for the developmentally challenged were false statements of material fact. The PDC further found, by clear and convincing evidence, that Rickert acted with "actual malice or reckless disregard" in sponsoring the brochure because she had actual knowledge through review of newspaper articles in *The Olympian* and the *Belfair Herald* that Senator Sheldon had not voted to close Mission Creek and she had failed to "make even a cursory check" of Senator Sheldon's voting record. AR at 411. It imposed a $1,000 fine on Rickert.

¶16 Rickert petitioned for review to the Thurston County Superior Court. Following a hearing, the superior court entered an order affirming the PDC's decision. However, it made no determination regarding whether the PDC erred in finding that Rickert had acted with actual knowledge of the statement's falsity. Additionally, the superior court upheld the constitutionality of RCW 42.17.530(1)(a).

¶17 On appeal, Rickert asserts that RCW 42.17.530(1)(a) is unconstitutional on its face and as it was applied to her. The basis of Rickert's argument is that the statute permits the government to impose sanctions on a candidate for engaging in constitutionally protected speech. She also argues that the statute violates procedural due process and is overbroad and viewpoint based. This is an issue of first impression before this court.

Constitutionality of RCW 42.17.530(1)(a)

A. *History of RCW 42.17.530(1)(a)*

¶18 When first enacted in 1984, RCW 42.17.530 provided that a person "shall not sponsor political advertising which contains information that the person knows, or should reasonably be expected to know, to be false." LAWS OF 1984, ch. 216, § 3. In 1988, the state legislature amended the statute to incorporate the "actual malice" standard set forth in *New York Times*.[3] LAWS OF 1988, ch. 199, § 1. As revised, the statute made it unlawful for a person "to sponsor with actual malice . . . [p]olitical advertising that contains a false statement of material fact." LAWS OF 1988, ch. 199, § (2)(1)(a).

¶19 Our Supreme Court, in *State ex rel. Public Disclosure Commission v. 119 Vote No! Committee*, 135 Wn.2d 618, 957 P.2d 691 (1998), addressed the constitutionality of former RCW 42.17.530(1)(a) (1998). A three-justice plurality opinion held that the statute was facially unconstitutional because it "chill[ed] political speech, usurp[ed] the rights of the electorate to determine the merits of political initiatives without fear of government sanction, and lack[ed] a compelling state interest in justification." *119 Vote No!*, 135 Wn.2d at 632.

¶20 The plurality opinion reasoned that the public, not the state, should determine truth and falsity in public debate, stating " 'In this field *every person* must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.' " *119 Vote No!*, 135 Wn.2d at 625 (quoting *Meyer v. Grant*, 486 U.S. 414, 419-20, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988)). Rather, a "campaign's factual blunder is most likely noticed and corrected by the campaign's political opponent." *119 Vote No!*, 135 Wn.2d at 626 (citing *Brown v. Hartlage*, 456 U.S. 45, 61, 102 S. Ct. 1523, 71 L. Ed. 2d 732 (1982)).

---

[3] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

¶21 Additionally, the plurality opinion found unpersuasive the State's reliance on defamation cases to justify intrusion into public debate. *119 Vote No!*, 135 Wn.2d at 629. It reasoned that the statute restricted political speech absent the competing interest in defamation cases—i.e., the legitimate state interest in compensating individuals for harm to their reputation—and, unlike a defamation suit, "creates a cause of action for the government to pursue against a private person." *119 Vote No!*, 135 Wn.2d at 630. The plurality opinion cited a law review article stating that, " '[T]he First Amendment precludes punishment for generalized "public" frauds, deceptions and defamation. In political campaigns the grossest misstatements [and] deceptions . . . are immune from legal sanction unless they violate private rights—that is, unless individuals are defamed.' " *119 Vote No!*, 135 Wn.2d at 629 (quoting Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty*, 59 U. CHI. L. REV. 225, 238 (1992)).

¶22 The plurality opinion concluded that former RCW 42.17.530(1)(a) was "patronizing and paternalistic" in assuming that "the people of this state are too ignorant or disinterested to investigate, learn, and determine for themselves the truth or falsity in political debate." *119 Vote No!*, 135 Wn.2d at 632. But it left unanswered whether the State may constitutionally prohibit false statements directed at another candidate. *119 Vote No!*, 135 Wn.2d at 627, 631.

¶23 Justices Barbara A. Madsen and Gerry L. Alexander agreed with the plurality opinion's analysis, making a majority of five justices finding the statute facially unconstitutional. However, Justice Madsen, with Justice Alexander concurring, wrote separately, "I am not convinced that the same is true where a statement contains deliberate falsehoods about a candidate for public office." *119 Vote No!*, 135 Wn.2d at 633 (Madsen, J., concurring). Justice Madsen reasoned that, because states may permit recovery of damages for defamation to public officials where the *New York Times* actual malice standard is satisfied, it is "reasonable to contend" that the legislature could enact a

law prohibiting a person from sponsoring with actual malice political advertising containing false statements of material fact about a candidate for public office. *119 Vote No!*, 135 Wn.2d at 635 (Madsen, J., concurring).

¶24 Following the court's decision in *119 Vote No!*, the legislature amended former RCW 42.17.530(1)(a) to its current form. LAWS OF 1999, ch. 304, § 2. RCW 42.17.530 provides in relevant part:

(1) It is a *violation of this chapter for a person to sponsor with actual malice*:

(a) *Political advertising that contains a false statement of material fact about a candidate for public office.* However, this subsection (1)(a) does not apply to statements made by a candidate or the candidate's agent about the candidate himself or herself.

. . . .

(2) . . . Any violation of this section shall be proven by *clear and convincing evidence.*

(Emphasis added.)

¶25 In addition, the legislature made the following findings in support of the 1999 amendment:

(2) The legislature finds that a review of the opinions indicates that a majority of the supreme court may find valid a statute that limited such a prohibition on sponsoring with actual malice false statements of material fact in a political campaign to statements about a candidate in an election for public office.

(3) It is the intent of the legislature to amend the current law to *provide protection for candidates for public office against false statements of material fact sponsored with actual malice.*

LAWS OF 1999, ch. 304, § 1 (emphasis added).

## B. *Analysis*

■■ ¶26 The facial constitutionality of a statute is a question of law requiring de novo review. *119 Vote No!*, 135 Wn.2d at 623. To assess the constitutionality of a state

election law, we first examine whether it burdens rights protected by the First Amendment. *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989). The first amendment to the United States Constitution provides in pertinent part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. CONST. amend. I. If the challenged law burdens First Amendment rights, it can survive constitutional scrutiny only if the state shows that it advances a compelling state interest and is narrowly tailored to serve that interest. *Eu*, 489 U.S. at 222.

¶27 The United States Supreme Court has "recognized repeatedly that 'debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution.' " *Eu*, 489 U.S. at 223 (alteration in original) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)). Such discussions are afforded the "broadest protection" in order to assure the " 'unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *Buckley*, 424 U.S. at 14 (quoting *Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957)). Thus, the First Amendment " 'has its fullest and most urgent application' to speech uttered during a campaign for political office"; a highly paternalistic approach limiting what people may hear is "generally suspect." *Eu*, 489 U.S. at 223 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S. Ct. 621, 28 L. Ed. 2d 35 (1971)).

¶28 The First Amendment " 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' " *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943), *aff'd*, 326 U.S. 1, 89 L. Ed. 2013, 65 S. Ct. 1416 (1945)). In *New York Times*, the Court declared,

"[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *N.Y. Times*, 376 U.S. at 271-72 (quoting *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d. 405 (1963)). Accordingly, we consider this case against the background of a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times*, 376 U.S. at 270.

¶29 The PDC contends that we should "analogize to the law of defamation as a basis for authorizing [the] state to prohibit false statements in political campaigns." Br. of Resp't at 30. It argues that under *New York Times* and its progeny, "knowing and deliberate lies," even when they occur during political debate, are not protected by the First Amendment.[4] Br. of Resp't at 24.

¶30 As aptly pointed out by the plurality opinion in *119 Vote No!*, the *New York Times* Court's determination that defamatory statements made with actual malice are not protected by the First Amendment was made in the context of a defamation suit—wherein the Court balanced the individual's right to recover for damage to his or her reputation against the speaker's First Amendment rights. *N.Y. Times*, 376 U.S. at 279-80. A defamation plaintiff must establish four essential elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) *damages*. *Herron v. KING Broad. Co.*, 109 Wn.2d 514, 521-22, 746 P.2d 295 (1987). Here, as with former RCW 42.17.530(1)(a) (1998), RCW 42.17.530(1)(a) restricts political speech absent the competing interest in a defamation suit. RCW 42.17-.530(1)(a) imposes no requirement of harm to a candidate's reputation; indeed, Senator Sheldon raised no claim that Rickert's statement injured his good name.

---

[4] The PDC also cites *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

¶31 Furthermore, *New York Times* held only that a public official may "recover[ ] damages" in tort for a defamatory statement made with actual malice; it did not speak to an action by the government against private individuals. *N.Y. Times*, 376 U.S. at 279. In light of these substantial differences and our great reverence for free and open debate in political campaigns, we will not apply only a portion of the elements of the law of defamation to find that any false statement of material fact about a candidate made with actual malice under RCW 42.17.530(1)(a) is undeserving of First Amendment protection. Rather, we hold that, under *New York Times*, only *defamatory* statements made in violation of the statute are not constitutionally protected speech. Specifically, there must be an element of injury before the speech is undeserving of First Amendment protection.

¶32 A review of other states' case law is also useful. At least 17 other states have enacted election laws similar to RCW 42.17.530(1)(a), including Alaska, Montana, Nevada, and Oregon.[5] Some of these statutes are identical to RCW 42.17.530(1)(a), while others require a mental state greater than actual malice or a particular type of statement about a candidate. *See* Nev. Rev. Stat. § 294A.345(1) (2004) (a person shall not publish with actual malice a false statement of fact concerning a candidate); Colo. Rev. Stat. § 1-13-109 (2004) (no person shall knowingly make a false statement relating to any candidate); and Miss. Code Ann. § 23-15-875 (2005) (no person shall deliberately make a false statement regarding a candidate's honesty, integrity, or moral character).

¶33 In *Ancheta v. Watada*, 135 F. Supp. 2d 1114, 1116 (2001), the court reviewed Hawaii State's Code of Fair

[5] Alaska Stat. § 15.56.012 (2005); Colo. Rev. Stat. § 1-13-109 (2004); Fla. Stat. § 104.271 (2005); La. Rev. Stat. Ann. § 18:1463(C) (2005); Mass. Ann. Laws ch. 56, § 42 (2005); Minn. Stat. § 211B.06 (2004); Miss. Code Ann. § 23-15-875 (2005); Mont. Code Ann. § 13-35-301, 302 (2004); Nev. Rev. Stat. § 294A.345(1) (2004); N.C. Gen. Stat. § 163-274(8) (2005); N.D. Cent. Code § 16.1-10-04 (2005); Ohio Rev. Code Ann. 3517.21(B) (2005); Or. Rev. Stat. § 260.532 (2003); Tenn. Code Ann. § 2-19-142 (2005); Utah Code Ann. § 20A-11-1103 (2005); W. Va. Code § 3-8-11(c) (2005); Wis. Stat. § 12.05 (2004).

Campaign Practices. At issue were provisions prohibiting campaign material that " 'misrepresents, distorts, or otherwise falsifies the facts regarding [a] candidate' " and statements amounting to " 'personal vilification [and] character defamation.' " *Ancheta*, 135 F. Supp. 2d at 1117, 1121 (quoting HAW. CODE R. § 2-14.1-25 Ex. A(3)). In determining whether speech subject to the Code was protected under the First Amendment, the court noted that "defamatory speech is undeserving of First Amendment protections." *Ancheta*, 135 F. Supp. 2d at 1122. However, because the Code was not limited to sanctioning defamatory speech made with actual malice against a public candidate, the court determined that "the Code regulat[ed] speech that is protected under *New York Times*." *Ancheta*, 135 F. Supp. 2d at 1122.

¶34 And in *Committee of One Thousand to Re-Elect State Senator Walt Brown v. Eivers*, 296 Or. 195, 674 P.2d 1159 (1983), the Oregon Supreme Court considered whether the defendant had violated a provision of the Oregon Corrupt Practices Act prohibiting a person from publishing any " 'false statement of material fact relating to [a] candidate.' " *Eivers*, 296 Or. at 197 (quoting OR. REV. STAT. § 206.532(1)). While the constitutionality of the provision was not at issue, Justice Hans Linde, writing separately, stated that the court's ruling did not imply that the statute itself was constitutional and noted that the statute was "not confined to defamatory or even critical statements about a candidate, nor to a remedy for injury to reputation." *Eivers*, 296 Or. at 206 n.1. (Linde, J., concurring).

¶35 However, the PDC argues that in *Treasurer of the Committee to Elect Gerald D. Lostracco v. Fox*, 150 Mich. App. 617, 623, 389 N.W.2d 446 (1986), the court stated that misleading or false statements are not constitutionally protected free speech. And in *In re Disciplinary Proceedings Against Donohoe*, 90 Wn.2d 173, 181, 580 P.2d 1093 (1978), our Supreme Court ruled that false statements do not fall within the protection of the First Amendment. In *Donohoe*, the appellant, a candidate for judicial office, was disciplined for violating a provision of the Code of Judicial

Conduct (Code) prohibiting persons from publishing a "statement with knowledge of its falsity during the course of a judicial campaign." *Donohoe*, 90 Wn.2d at 182. In rejecting the appellant's contention that the provision violated her constitutional right to freedom of speech, the court stated, "[w]e do not believe that the First Amendment protects one who utters a statement with knowledge of its falsity, even in the context of a judicial campaign. Such speech is not beneficial to the public." *Donohoe*, 90 Wn.2d at 181.

¶36 *Donohoe* is distinguishable from the instant case. First, it addressed only false statements made with *knowledge* of falsity; the court did not find that statements made with reckless disregard for truth or falsity is unprotected by the First Amendment. Thus, RCW 42.17.530(1)(a), which sanctions statements made with either knowledge or reckless disregard of falsity, is broader than the Code provision at issue in *Donohoe*. Second, the Code provision at issue in *Donohoe* was promulgated by the court, i.e., the legal profession, not the legislature, to maintain the "respect" and "dignity" due the courts of justice. *Donohoe*, 90 Wn.2d at 180. *See In re Disciplinary Proceedings Against Kaiser*, 111 Wn.2d 275, 295, 759 P.2d 392 (1988) (in the context of a judicial campaign, there are other competing societal concerns that override the need for unrestrained freedom of speech). Furthermore, to the extent that these cases suggest that speech beyond that proscribed by *New York Times* is not protected by the First Amendment, we find them unpersuasive.

¶37 In sum, the United States Supreme Court has narrowly defined the permissible occasions for sanctioning an individual who speaks on matters of public concern and political discourse. We agree that under *New York Times*, the government may sanction false speech made with actual malice that defames a public official; it appears that the legislature intended to adopt the *New York Times* standards in 1988. But the PDC points to no convincing

464

authority suggesting that we should apply only a portion of the law of defamation to the instant case or determine that materially false statements *alone* under RCW 42-.17.530(1)(a), regardless of whether they are defamatory, are not constitutionally protected. Accordingly, we hold that the statute regulates protected speech and now consider whether it survives strict scrutiny.

■ ■ ¶38 Regulation of protected speech based on its content is presumptively unconstitutional. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). The state bears the burden of showing a compelling interest to justify the burden placed on protected speech. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978).

¶39 The PDC asserts a compelling state interest in promoting the honesty and integrity of the elections process.[6] Rickert responds that, in accordance with the plurality opinion's holding in *119 Vote No!*, we should find that political truth should be determined solely by the citizenry and not the state. She argues that a majority of the *119 Vote No!* court held that the "official regulation of truth-telling" in political campaigns was not a legitimate state purpose. Br. of Appellant at 45.

■ ¶40 But the *119 Vote No!* plurality opinion did not hold that the government may never regulate protected political speech to protect the integrity of elections; its decision was limited to the statute at issue. *See 119 Vote No!*, 135 Wn.2d at 624-25, 627-28, 632. Moreover, the United States Supreme Court has stated that a state's interest in preventing *fraud* and *libel* "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995).

[6] The PDC does not rely on the statement of legislative intent that the act was intended to protect candidates—this is not a compelling state interest, it is a private interest wherein the candidate is protected by the law concerning defamation. Instead, the PDC correctly attempts to rely on the compelling state interest in promoting honesty and integrity of the elections process.

¶41 The Ninth Circuit recently analyzed an election statute under *McIntyre*. *See Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979 (9th Cir. 2004). In *Heller*, the court held unconstitutional a Nevada provision requiring groups or entities publishing " 'any material or information relating to an election, candidate or any question on the ballot' " to reveal the names and addresses of the publication's financial sponsors. *Heller*, 378 F.3d at 981. In rejecting the state's asserted interest in preventing fraud and libel, the court found that the Nevada statute was not limited to speech " 'during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large.' " *Heller*, 378 F.2d at 996 (quoting *McIntyre*, 514 U.S. at 349).

¶42 The court reasoned that the statute was (1) temporally ill-adapted to the "special concerns" regarding fraud or libel during an election campaign because it could prevent speech "far removed from the thrust and parry" of a campaign and (2) substantively ill-adapted because it imposed no requirement that any member of the pertinent electorate be exposed to, or influenced by, the publication. *Heller*, 378 F.3d at 996. Further, the statute provided an exception for communications by candidates and political parties; the court stated, "no reason appears why candidates and political parties are less likely to engage in election-related fraud than other groups and entities; if anything, one would expect the opposite to be the case." *Heller*, 378 F.3d at 996. The court concluded that the statute was not narrowly tailored to further the state's interest in libel and fraud prevention. *Heller*, 378 F.3d at 997.

¶43 As well, RCW 42.17.530(1)(a) is not limited to speech made "during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *McIntyre*, 514 U.S. at 349. It is not temporally limited to statements made close in time to an election when a candidate might be unable to defend against the statements before the public.

¶44 Furthermore, as with the Nevada provision, RCW 42-.17.530(1)(a) does not apply to statements made by a candidate or the candidate's agent about the candidate him- or herself. The PDC presents no compelling reason why a candidate would be less likely to deceive the electorate on matters concerning him- or herself and compromise the integrity of the elections process. The PDC has therefore failed to establish that RCW 42.17.530(1)(a) is narrowly tailored to further its interest in preventing dishonesty in elections.

¶45 Moreover, RCW 42.17.530(1)(a) is unconstitutionally overbroad in that it covers every false statement of material fact made with actual malice—regardless of whether it is defamatory. *See 119 Vote No!*, 135 Wn.2d at 627-28. Thus, RCW 42.17.530(1)(a)'s prohibition against *any* false statement of material fact about a candidate chills *protected political speech.*

¶46 Nevertheless, the PDC contends that the courts of other states have upheld the constitutionality of statutes similar to RCW 42.17.530(1)(a), citing *Snortland v. Crawford*, 306 N.W.2d 614 (N.D. 1981) and *Commonwealth v. Wadzinski*, 492 Pa. 35, 422 A.2d 124 (1980). In *Snortland*, the North Dakota State Supreme Court, in analyzing a violation of a provision of the state election statute, construed the use of the term "knowingly" in the statute to mean that the trier of fact must apply the actual malice standard of *New York Times. Snortland*, 306 N.W.2d at 623. The court stated, "[I]t is difficult to conclude that an equally stringent safeguard is not necessary in the instant case which also . . . affects precious rights under the First Amendment far broader than one's reputation." *Snortland*, 306 N.W.2d at 623. However, the court did not analyze the constitutionality of the statute and thus adds little to our analysis.

¶47 In *Wadzinski*, the Pennsylvania State Supreme Court stated that "state regulation whose scope is limited to false campaign statements knowingly or recklessly made *may* be sustained." *Wadzinski*, 492 Pa. at 45 (emphasis

added). The court further stated, "It is clear that *some* regulation of campaign speech designed to protect other than reputational interests may be sustained"; however, "We hasten to add . . . that [government interest in preventing corruption in the political process] will not justify any law that places a substantial burden on protected political speech." *Wadzinski*, 492 Pa. at 46 (emphasis added). But *Wadzinski* is not binding precedent and offers no specific guidance concerning the issues raised in this case. Moreover, to support its claim, the court relied upon case law immaterial to our analysis. *Buckley*, 424 U.S. 1, dealt with campaign finance. *See also 119 Vote No!*, 135 Wn.2d at 629 n.8.

¶48 In conclusion, we adopt the plurality opinion's rationale in *119 Vote No!* and follow the Ninth Circuit's reasoning in *Heller*, and we hold that RCW 42.17.530(1)(a) is not narrowly tailored to the PDC's interest in promoting integrity and honesty in the elections process and chills protected political speech. Accordingly, we need not reach Rickert's other arguments that the statute is viewpoint-based and that it violates procedural due process protections because it fails to provide for determination of liability by a jury. As well, we do not address the application of the statute to Rickert's statements to determine whether she violated the unconstitutional statute.

¶49 Reversed.

Van Deren, A.C.J., and Houghton, J., concur.

Review granted at 156 Wn.2d 1035 (2006).